[No. H020689. Sixth Dist. June 5, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD GLENN COELHO, Defendant and Appellant.

## COUNSEL

Paul V. Carroll, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Bruce Ortega and Jeremy Friedlander, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

## WUNDERLICH, J.—

### I. *Introduction*

Under the "Three Strikes" law, the court must impose a consecutive sentence for each current offense "not committed on the same occasion, and not arising from the same set of operative facts . . . ."[1] (Pen. Code, §§ 667, subd. (c)(6), (7), 1170.12, subd. (a)(6), (7).) Conversely, if the current offenses were committed on the same occasion and arose from the same set

---

[1]The statutory phrase "committed on the same occasion" refers to "at least a close temporal and spatial proximity between the acts underlying the current convictions." (*People v. Deloza* (1998) 18 Cal.4th 585, 595, 599 [76 Cal.Rptr.2d 255, 957 P.2d 945].) The statutory phrase "arising from the same set of operative facts" refers to "sharing common acts or criminal conduct that serves to establish the elements of the current felony offenses of which defendant stands convicted." (*People v. Lawrence* (2000) 24 Cal.4th 219, 233 [99 Cal.Rptr.2d 570, 6 P.3d 228].)

All further statutory references are to the Penal Code unless otherwise specified.

of operative facts, the court has discretion to impose consecutive or concurrent sentences. (*People v. Hendrix* (1997) 16 Cal.4th 508, 512-513 [66 Cal.Rptr.2d 431, 941 P.2d 64]; *People v. Hall* (1998) 67 Cal.App.4th 128, 137-138 [79 Cal.Rptr.2d 690]; *People v. Bell* (1998) 61 Cal.App.4th 282, 294 [71 Cal.Rptr.2d 415].) Thus, to determine the scope of its discretion, a court must know the factual basis of each conviction. In this case, we hold that if the jury could have based its verdicts upon a number of unlawful acts and the court cannot determine beyond a reasonable doubt the particular acts the jury selected, the court should assume that the verdicts were based on those acts that would give it the most discretion to impose concurrent terms.

## II. *Statement of the Case*

In 1996, the Santa Cruz County District Attorney charged defendant with 10 counts of lewd and lascivious conduct with a minor under the age of 14 (§ 288, subd. (a)), alleging generally that each act occurred between January 13 and March 2, 1996. At trial, the prosecution introduced evidence of more than 10 lewd acts, some that occurred on different occasions and others during a single episode on March 2, 1996. The jury returned 10 guilty verdicts and also found that defendant had two prior convictions that qualified as "strikes" under the Three Strikes law. At sentencing, the court found consecutive sentences mandatory and imposed ten 25-year-to-life terms and two consecutive five-year enhancements.

Defendant appealed, claiming, among other things, that the court erroneously thought consecutive sentences on all counts were mandatory. He argued that the jury could have based some of its verdicts on the acts of March 2, and because they were committed at the same time, the court would have had discretion over those convictions. The People agreed that the court misunderstood the scope of its discretion but argued that only two of the convictions were based on acts of March 2. Given defendant's 260-year sentence, the People proposed that we modify the judgment to reflect nine consecutive terms and one concurrent term, making remand unnecessary.

In *People v. Coelho* (Apr. 9, 1999, H017064) (nonpub. opn.) (hereafter *Coelho I*), we agreed that the trial court misunderstood the scope of its discretion.[2] However, we declined to modify the judgment because, contrary to the People's argument, the record did not reveal how many convictions the trial court may have thought were based on the acts of March 2 and thus over how many convictions it erroneously believed it lacked discretion.

---

[2] We have granted defendant's request that we take judicial notice of the record in *Coelho I*. (See Evid. Code, § 452, subd. (d).)

(*Coelho I, supra,* H017064.) We remanded the matter, advising the court to "make a record that will permit a reviewing court, if necessary, to determine the factual and legal bases for any consecutive sentence." (*Ibid.*)

On remand, defendant asserted that there was evidence of seven unlawful acts committed on March 2: one act of masturbation, one act of oral copulation, and five acts of digital penetration. He argued that because the factual bases for the 10 verdicts are unclear, the court should assume that seven of the 10 verdicts were based on the acts of March 2 and exercise discretion on seven counts. The prosecutor argued that the jury convicted defendant of only two acts committed on March 2: masturbation and one digital penetration. Thus, the court had discretion over only two counts.

The trial court agreed with the prosecutor and exercised its discretion to reimpose two consecutive terms. In doing so the court stated, "I've handled a lot of sentencings in sex cases in my career and on the issues of whether it's appropriate for consecutive or concurrent sentencing simply based on separate and distinct acts, time to reflect, you know, all that sort of thing. [¶] These are really separate and distinct acts. I am sorry I don't have a lot of sympathy for [defendant]. His conduct—it is one thing to have the child orally copulate him; it's another thing for him to digitally penetrate the child. They're separate, distinct; they provide for thought in between."[3]

Defendant appeals from this judgment. He claims the court erred in finding that it had discretion over only two counts. He also claims the court abused its discretion in reimposing consecutive terms for the two counts. We agree with defendant's first claim but not his second. However, under the unique circumstances of this case, we decline to remand the matter again and affirm the judgment.

### III. *Facts*

In 1993, while in prison, defendant began to correspond with Katrina M., the sister of another inmate. Thereafter, she visited him, and they fell in love. In 1994, after his release, they were married, and defendant started living with Katrina and her three daughters. Some time later, Katrina became pregnant and gave birth to another daughter (R.). Before R. was born, however, Katrina's relationship with defendant became strained because he would stay out late at night. Katrina suspected that he was taking drugs and seeing a woman named Lori Franklin.

---

[3]The People assert, and we agree, that in referring to oral copulation, the court misspoke. The prosecutor's arguments and the court's other comments make it clear that two convictions over which the court was exercising discretion involved one act each of masturbation and digital penetration.

Just before R.'s birth, defendant violated parole and was sent back to prison. After his release, he returned to the family. His behavior started out good but then changed, and he became cold, aloof, and hostile. Katrina became suspicious again and confronted him and Franklin. Although he denied being involved, Katrina did not believe him and bought a voice-activated tape recorder to eavesdrop on him.

On March 2, 1996, defendant told Katrina he was taking one of her daughters (M.) with him on an errand. At the time, M. was almost nine years old. Unbeknownst to defendant, Katrina had put the tape recorder in a diaper bag in the car. When defendant returned, she went to the car and listened to the tape. She heard M. say, "Daddy, my hand is tired. Can I stop?" Defendant said he wanted to show her something and asked her to spread her legs. M. giggled because he was tickling her. He asked why she was not wearing underwear. She told him she did not know why. At one point, M. asked defendant not to touch her, and he responded, "Why not? You let [your sister] touch you in the bathtub." M. denied this, but defendant continued, "[W]ell, you're going to let your boyfriend touch you that way." M. asked him to stop, but he said, "It won't hurt you to give me some once in a while, will it?" M. continued to protest, and defendant became aggressive, saying it would not hurt her to let him touch her. When M. continued to resist, defendant turned the car on, and Katrina could no longer hear any conversation.

After listening to the tape, Katrina drove to a store and called defendant. At first, she mocked him, asking how her "spirit-filled man of God" was doing. Then she repeated what she had heard on the tape. Defendant became enraged and denied everything. She suggested letting his parole officer decide and threatened to play the tape on his voice mail. Defendant asked Katrina if she wanted a divorce, and she said she did. Defendant admitted molesting M. but threatened to take R. if Katrina did not give him the tape.

Katrina drove home. Her neighbor was in the driveway, and Katrina told her defendant had molested M. Defendant came outside with R., and Katrina told him to go. When he left with R., Katrina chased after him in the car. She found him at the nearby ravine and told him to get in the car. Defendant asked her for the tape recorder. When Katrina could not find it, defendant took R. and started to leave. Katrina searched again, found the recorder, and gave it to defendant. They then returned to the house.

At home, defendant listened to the tape. When he heard his conversation with M., he became enraged, ripped the tape out of the recorder, and flushed it down the toilet. He told Katrina, "If I'm going down, I might as well kill

all of you right now." Katrina defiantly said, "Go ahead and kill me. I know I'm going to go to heaven. Go ahead and do it." At that point, defendant sat down and began to cry, saying, "I don't know what is wrong with me. I feel like I have a psychotic mind. I would never hurt you or these kids." Later, however, he blamed M., claiming that she had reached into his pocket for candy and grabbed his private parts. M. called him a liar. He admitted touching her but continued to make excuses. Katrina got hysterical, and defendant became disgusted and said, "If there can't be love and forgiveness, why don't we both just not drag each other through the mud. You go your way and I'll go mine." However, he agreed to leave the next morning.

Later that evening, Katrina called her sister (Tina B.) and told her about the tape and her confrontation with defendant. She said defendant had flushed the tape down the toilet and threatened her and the children. Tina got hysterical and wanted defendant out of the house immediately. Tina believed defendant was capable of murder and told Katrina to call the police. Katrina was too afraid and said defendant would be leaving for his mother's house the next day. However, the next day, Tina called, and when she learned defendant was still there, she called the police.

Sheriff's Deputies Amy Christey and Barry Wallace of the Santa Cruz County Sheriff's Department responded. Defendant, Katrina, and the children were all at home. When Christey explained why they had come, Katrina got flustered. She called Tina a liar who would say anything to send defendant back to prison. When Christey asked about the tape, Katrina admitted hearing M. say, "squeeze it harder to put it on." However, she explained that defendant told her M. was talking about how to get a fake toy finger onto her real finger. Katrina first said the tape had been erased and then that it had been destroyed. Later, she gave Christey a blank tape, which she falsely identified as the recording of M.

Christey also spoke to M. privately. At first M. denied going anywhere with defendant. Later, she said they went to Burger King. She became less relaxed and talkative when asked whether anyone had touched her private parts. Only her mother, she said.

Christey and Wallace left, and Katrina suggested that defendant leave because Tina would not rest until he was back in jail. Defendant asked Katrina and M. if they had said anything to anyone else, and they said no. Defendant then left. Meanwhile, Christey called Tina to get more firsthand information and then called Katrina. She related what Tina had told her, expressed concern about M., and said she wanted to clear up some confusion about the tape. Katrina again called Tina a liar. Later, Tina called Katrina

and accused her of turning M. into a liar. She said the police knew that Katrina was lying and were going to return. She then falsely warned Katrina that if she lied again, the police would take the children into protective custody. After speaking to Tina, Katrina decided to call the police.

Christey returned to Katrina's house, and Katrina confirmed Tina's report. She admitted that she had lied but said she was afraid of defendant because he had threatened to kill everyone. M. also apologized to Christey for not telling the truth. Christey told M. that another officer would be coming to talk to her. Deputy James Hart of the Santa Cruz County Sheriff's Department arrived and spoke to M. She told him that during the time defendant was living with them, he had made her lick, suck, and/or rub his penis about 15 times. She also reported that the day before, defendant had put his finger in her private parts while they were in the car. She told him to stop, but he said she should get used to it because her boyfriend would be doing it to her some day. She did not remember any other instances of digital penetration. Hart testified that M. was generally bright and upbeat during the interview but looked down and seemed distracted when talking about sexual matters.

After the interview, Hart took Katrina and M. to the hospital, where M. was examined. Hart had Katrina page defendant. Defendant returned the call and spoke to Katrina. She then let Hart speak to him. Hart outlined the accusations against him and suggested that he surrender. Defendant denied any wrongdoing and claimed Katrina and Tina were setting him up. However, he agreed to surrender after he spoke to family members and an attorney. He said he would call Hart back, but he never did.

Katrina and the girls stayed at a shelter for the next couple of days and then returned home. Defendant called and said he would be coming by to pick up a piece of gardening equipment he intended to sell. Katrina told him the police were looking for him. He said he was avoiding the police because if he returned to prison for molestation, he would be killed. Katrina reported this conversation to Hart, who then came to the house. When another person arrived and took the equipment, Hart followed him to a car, where defendant was waiting. Hart then arrested defendant.

Before defendant was arrested, Latisha Marshall, a senior detective with the Santa Cruz Sheriff's Department, interviewed M. Marshall had substantial experience interviewing minors in molestation cases. M. said she initially lied to Christey because her mother was afraid defendant would kill them and told her to lie. She reported that defendant started to make her touch or suck him after he returned home from prison. According to Marshall, M. said that one day, she masturbated defendant in the car on their

way to and from a store; another day she masturbated him in the car to and from some friends' house. She reported orally copulating him one day in the car when they were on an errand. She also related an incident that occurred in a ravine near her home. There, she squeezed his penis, and it looked like he "peed." M. further said that she masturbated defendant in the house, one time in a rocking chair and another time in the kitchen. Last, M. described what happened on March 2, when they ran an errand and then went to Burger King. Defendant told her to masturbate and orally copulate him, but she objected to oral copulation. She also said she told defendant that her hand was tired from squeezing his penis, and he told her to move it faster. Later, defendant put his hand up her dress, rubbed her vagina, and penetrated her.

At trial, M. testified that defendant touched her private parts and she touched his penis. Although she could not remember how many times she touched him, she said she did so a lot in the car. In addition, she touched him in the woods and in a ravine near the house, two times in her room upstairs, one time in the kitchen, and one time in the living room while he was on a rocking chair. She testified that defendant made her suck his penis two times in the house and one time in the car. She said that on March 2, she touched defendant in the car. Initially she could not remember if she orally copulated him that day but later said she did. She also said defendant penetrated her with his finger. Concerning the number of penetrations, she variously testified "about four times," "about five," "[l]ike four or five, something like that," and "I don't know the exact number but, like, a lot." M. testified that defendant told her to keep their touching a secret. She obeyed because she thought he might hurt her family.

After Marshall interviewed M., she interviewed Katrina with an assistant district attorney present. Marshall did not tell her what M. had said. Katrina was concerned about losing her children. She said that some years before, M. had been molested, but it had involved a different type of sexual conduct.[4] She also explained how she made the tape recording, confronted defendant with it, and gave it to him when he threatened to take R. Katrina admitted telling M. to lie but said she did so because she was afraid of defendant.

Marshall spoke briefly with defendant after his arrest. She explained the charges, which he denied. He said M. was a liar and had been molested before. He claimed Katrina and M. were trying to get him out of the house.

---

[4]At trial, Katrina testified that in 1994, she moved from Southern California to Santa Cruz after learning that David R., the father of one of her girls, had orally copulated M. in 1992. Katrina reported him, and he confessed. At trial, M. said she could not remember the David R. molestation.

He said he wanted to talk to the district attorney about a deal because he did not want to go back to prison with a "molest jacket," i.e., as a convicted child molester.

Stella Rebollar, defendant's parole officer, also interviewed defendant. She told him she put a parole hold on him for absconding, drug use, and the molestation charges. He admitted that he had used heroin, cocaine, and methamphetamines during the previous weeks. He explained that he moved out of the house because he and Katrina fought. He denied molesting M. and said that Katrina had also made M. lie about the David R. molestation. However, he admitted that M. may have touched him when she sat on his lap. According to defendant, Katrina's tape recording was blank. He could not remember what happened to it. He said that on March 2, M. told him she was not wearing underpants. He pulled up her shorts and discovered she was telling the truth.

The same day that Rebollar interviewed defendant, Katrina called Marshall and said defendant was ready to confess. Marshall and the assistant district attorney interviewed him. Defendant explained that one day, M. reached into his pocket for candy or change and touched his penis. He let her do it again, then began to ask her to do it, and taught her how to masturbate him. He said he never ejaculated. He admitted she orally copulated him one time and thought it happened during the incident that Katrina had secretly taped. On that occasion, he also touched M. because she did not have underpants on. He also said that M. touched or squeezed his penis in a ravine near their house. According to defendant, M. masturbated him three or four times and orally copulated him once. Defendant further related how Katrina called him one night and mocked him. He knew something was wrong, and when she came home, she confronted him with the tape. He listened and heard M. talking about masturbating him. He and Katrina started to argue, and when she threatened to bring the tape to his parole officer, he flushed it down the toilet.

At trial, Katrina testified that after defendant's arrest, he called her frequently from jail. She said he was careful during the calls because he assumed they were being recorded. She said that after he confessed, he called her in a panic. He urged her to lie and say she made everything up out of jealousy. She refused to do so and jeopardize her children. Nevertheless, Katrina supported defendant emotionally and financially after his arrest. She also wrote him numerous letters and regularly visited him until August. She testified that during one visit, defendant traced the word "escape" on the window separating them and mouthed the words "be ready."

At trial, the prosecutor presented evidence that on July 15, 1996, jail guards discovered tampering on the window screen in cell 12 of block E and

that defendant had been assigned to that cell from May 19 to June 9, 1996. Thereafter, he was in a different cell in block E.

*The Defense*

Defendant testified that he has prior convictions for attempted robbery, armed robbery, and petty theft with a prior.

Defendant further testified that during their first year of marriage, he and Katrina separated a few times because of her jealousy. He was sent back to prison for a parole violation, and sometime after his release, he moved back with Katrina and the girls. He denied molesting M. and claimed that she and Katrina had lied.

Defendant explained that on March 2, he and M. drove to a Jack-in-the-Box and then to Thrifty for school supplies. There, he also bought M. a toy bloody finger and a straw finger puzzle, which she wanted to bring to school for "share time." At the store, M. said she had no underpants on. He thought she was lying, so he checked and saw that she was wearing underpants. He denied touching M. on the drive back home. He said that on the way, he told her that once the straw finger puzzle was on, she had to squeeze the ends to get it off.

After he and M. returned, Katrina left to go to the store. She called to say she was going to his mother's house to see if he had gone to work that day. When she returned home, she accused him of molestation. She said she heard M. say something about "squeezing" and gave him a tape recording. However, when he listened to it, he heard only some inaudible mumbling between him and M. He said Katrina erased the tape after he listened to it. He denied flushing it down the toilet and said Katrina told him to say he had. Katrina also began to accuse him of being unfaithful, but when he started to leave, she begged him to stay. He remained, but they continued to argue.

The next day the police interviewed Katrina and M. He heard Katrina say that the allegations against him were false and that Tina B. just wanted him out of the house. After the officers left, he and Katrina argued because she still thought he was being unfaithful. He considered her molestation accusation the "last straw," so he packed some belongings and left.

The next day, he spoke to Katrina and Deputy Hart, who were at the hospital. He thought the allegations against him had been cleared up, but Hart told him Katrina was still accusing him. He promised to call Hart back but got "tied up in other things" and never did. He denied trying to avoid

arrest. According to defendant, Katrina paged him constantly, and he returned the calls to check on the girls. He explained how once, Katrina threatened to "fix [his] wagon" if he left her.

Defendant testified that even though he was innocent, he became interested in a deal with the district attorney because he felt he had "no chance" and feared his life would be in jeopardy unless the charges were changed. He said that around March 8, Katrina called a few times and said that if he really loved her, he would admit four charges so that her children would not be taken from her. She told him she could ask the district attorney to change the charges so he would not be at risk in prison. She said she loved him, promised to stand by him, and make sure he got family visits. She said she was a jealous person and admitted that she had gotten him into this "mess" but did not want him to go through it alone. Defendant was skeptical of the proposal at first. He thought she was lying and trying to get rid of him. He did not want to sacrifice his life and told her that if he pleaded guilty, he would not get family or conjugal visits. However, he felt that the life he had built was being torn from him. He ultimately believed Katrina was sincere. Although he was innocent, he was willing to sacrifice his life for his daughter and family and confess. He then admitted to Marshall that he had molested M. Soon thereafter, he recanted because Katrina stopped visiting him. He realized that she had just played on his emotions.

Defendant denied trying to escape from jail. He said that his cellmate Albert Garcia tried to pry open the cell window. He did not want to be involved and moved to a different cell. He admitted writing "escape" on the window when Katrina visited him but said he was merely telling her about Garcia's attempt.

## IV. *The Trial Court's Discretion to Impose Concurrent Terms*

As noted, defendant contends the court erred in finding that it had discretion over only two counts. He reiterates the argument he asserted below that because the factual bases for the jury's verdicts are unclear, the court should have assumed that 7 of the 10 verdicts were based on acts committed on March 2. ▮▮▮ The People argue that the court properly found that only two convictions were based on acts of March 2.[5]

---

[5]The People note that in *Coelho I,* defendant asserted that the victim related six acts on March 2—she masturbated him and he digitally penetrated her five times; but he now asserts *seven*: the original six plus one act of oral copulation. The People do not claim there is insufficient evidence to support the seventh act. Rather, they urge us not to consider a seventh

## A. *The Need to Discern the Factual Bases for Multiple Convictions*

 ██ ██ As noted, to determine the scope of its discretion, a court must know the factual basis for each conviction, for only then can it make a finding concerning whether the offenses occurred on the same occasions and under the same circumstances.[6] In some situations, the factual bases of the verdicts will be obvious. For example, where the defendant is charged with three offenses, the prosecutor introduces evidence of *only* three unlawful acts, and the jury convicts on all counts. Or, for example, where the defendant is charged with three offenses, each committed on a *different* occasion, and the prosecutor presents evidence of more than one act on each occasion. In that case, the court may not know exactly which act the jury found that the defendant committed on each occasion, but it can be certain that the three convictions were based on acts that occurred on different occasions. Here, however, because more acts were shown than were charged and the charges all related to the same time period, it is much more difficult to determine the bases for the jury's verdicts.

The first question we must answer is whether the court may resolve the ambiguity by assigning any unlawful act it wants to each verdict. The People argue that the court may not, and we agree.

 Under Fifth and Sixth Amendments to the United States Constitution made applicable to the states via the Fourteenth Amendment, a defendant in

---

act because defendant could have asserted a seventh act in *Coelho I* and does not now explain why he failed to do so.

The general rule is that a defendant may not raise an issue in a second appeal that could have been raised in the first, absent a showing of good cause or justification. (*People v. Senior* (1995) 33 Cal.App.4th 531, 538 [41 Cal.Rptr.2d 1].) However, this rule is not mandatory. We decline to apply it in this case because defendant's lapse was not in failing to raise an issue but in failing to articulate the precise scope of his previous claim.

[6]We use the phrases "under the same circumstances" and "under different circumstances" as a convenience and do not intend to suggest meanings other than, respectively, arising from the same set of operative facts and arising from a different set of operative facts.

We also assume that a finding on this factual issue at sentencing is one the court is constitutionally authorized to make. (See *Apprendi v. New Jersey* (2000) 530 U.S. 466, 489-492 [120 S.Ct. 2348, 2362-2363, 147 L.Ed.2d 435] [holding that any fact, other than prior convictions, that increases the penalty for a crime beyond the maximum prescribed for it by statute must be submitted to the jury, unless the jury is waived, and proved beyond a reasonable doubt]; *Jones v. United States* (1999) 526 U.S. 227, 248-249 [119 S.Ct. 1215, 1226-1227, 143 L.Ed.2d 311]; *Almendarez-Torres v. United States* (1998) 523 U.S. 224, 230, 243 [118 S.Ct. 1219, 1224, 1230-1231, 140 L.Ed.2d 350]; *McMillan v. Pennsylvania* (1986) 477 U.S. 79, 86-90 [106 S.Ct. 2411, 2416-2418, 91 L.Ed.2d 67]; see also *People v. Hernandez* (1988) 46 Cal.3d 194 [249 Cal.Rptr. 850, 757 P.2d 1013] [distinguishing between the court's authority to make findings of facts related to sentencing and the appropriate punishment and the jury's exclusive authority to determine the wrongful conduct for which punishment may be imposed].)

a state prosecution may not be convicted of a crime unless the jury finds "beyond a reasonable doubt . . . every fact necessary to constitute the crime with which he is charged." (*In re Winship* (1970) 397 U.S. 358, 364 [90 S.Ct. 1068, 1073, 25 L.Ed.2d 368]; see also *Sullivan v. Louisiana* (1993) 508 U.S. 275, 277-278 [113 S.Ct. 2078, 2080-2081, 124 L.Ed.2d 182].) Moreover, under article I, section 16 of the California Constitution, a criminal defendant's right to a jury trial further includes the right to a *unanimous* verdict.[7] (*People v. Nesler* (1997) 16 Cal.4th 561, 578 [66 Cal.Rptr.2d 454, 941 P.2d 87]; *People v. Wheeler* (1978) 22 Cal.3d 258, 265 [148 Cal.Rptr. 890, 583 P.2d 748]; *People v. Superior Court* (1967) 67 Cal.2d 929, 932 [64 Cal.Rptr. 327, 434 P.2d 623, 25 A.L.R.3d 1143].) ▮ Together, these constitutional guarantees ensure, among other things, that when the prosecutor presents evidence of more than one unlawful act for a given charge, *the jury* will not only determine whether all elements of the offense have been proved beyond a reasonable doubt but also unanimously agree on the particular unlawful act that forms the basis of each conviction.

The People also persuasively argue that if at sentencing a court had authority to clarify ambiguous verdicts and assign factual bases to convictions other than those actually found by the jury, then a court could negate the defendant's right to a jury trial by interchanging acquittals for convictions. To illustrate this point, the People submit the following hypothetical. "Suppose a defendant is identically charged with two counts of rape. There is substantial evidence of three rapes: two (in close succession) on day one and one on day two. Finding that appellant committed only the crimes on day one, the jury convicts him of two counts of rape, as charged. The sentencing judge then imposes consecutive sentences, reasoning that (1) the jury's verdicts leave unclear which alleged acts were the basis for the two convictions, (2) the court itself believes that the defendant committed only one rape on day one but another on day two, and therefore (3) the crimes occurred on separate occasions and had separate intents. Such a decision would in effect transform a conviction (the second act on day one) into an acquittal and an acquittal (the act on day two) into a conviction—with at least potentially serious consequences to the defendant." Indeed, such a decision would constitute a determination of guilt by the *wrong* entity—the trial court rather than the jury. (Cf. *Sullivan v. Louisiana, supra,* 508 U.S. at

---

[7]The Sixth Amendment similarly requires a unanimous verdict in *federal* prosecutions. However, as the People correctly point out, that facet of the Sixth Amendment right is not applicable to the states via the due process guarantee of the Fourteenth Amendment. Nor does it appear to be independently required by the Fourteenth Amendment itself. (*Apodaca v. Oregon* (1972) 406 U.S. 404 [92 S.Ct. 1628, 32 L.Ed.2d 184]; *Johnson v. Louisiana* (1972) 406 U.S. 356 [92 S.Ct. 1620, 32 L.Ed.2d 152]; see *In re Carpenter* (1995) 9 Cal.4th 634, 676 [38 Cal.Rptr.2d 665, 889 P.2d 985] (dis. opn. of Mosk, J.); *People v. Whitham* (1995) 38 Cal.App.4th 1282, 1294 [45 Cal.Rptr.2d 571].)

pp. 280-281 [113 S.Ct. at pp. 2082-2083] [right to a jury trial prohibits reviewing court from deeming defective reasonable doubt instruction harmless error because court, not jury, determines guilt].)

In short, the People submit, and we agree, that at sentencing, a trial court *must* accept and rely upon the same factual basis which the jury unanimously selected and relied upon to convict the defendant on a particular count. Such a rule protects the defendant's federal and state constitutional rights to a jury trial and ensures that he or she is punished for only those offenses the jury found beyond a reasonable doubt that he or she committed.

## B. *The Standard for Determining the Factual Bases for Multiple Convictions*

■ We asked the parties for supplemental briefing on the standard for determining the factual basis for a jury's verdict. They concur that the federal standard of certainty beyond a reasonable doubt applies. (See *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 828, 17 L.Ed.2d 705, 24 A.L.R.3d 1065].) We agree.

Their position finds support in *United States v. Dennis* (11th Cir. 1986) 786 F.2d 1029 and *U.S. v. Melvin* (1st Cir. 1994) 27 F.3d 710, where the courts applied the federal standard in circumstances analogous to those here.

In *Dennis*, the defendants were charged with conspiracy to distribute controlled substances, including heroin, cocaine, and marijuana, and the prosecution presented evidence to support a conviction involving each of these substances. Because the maximum punishment varied depending on object of the conspiracy—up to 5 years for marijuana versus up to 15 years for heroin or cocaine—the defendants requested a special verdict that, in the event of a guilty verdict, required the jury to specify the object(s) of the conspiracy. The court denied the request, and the jury returned a general verdict. At sentencing, the court imposed sentences of over five years. On appeal, two defendants claimed the trial court could not know whether the jury convicted them of conspiracy to distribute cocaine or heroin, as the sentencing judge had assumed, or *only* marijuana. (*United States v. Dennis, supra*, 786 F.2d at pp. 1037-1038.)

The court of appeals conceded that in cases like this, special verdicts should be given because without one, it may be "impossible" to determine which drugs the jury found to have been involved. Nevertheless, the court found that the failure to do so in this instance was not reversible error. (*United States v. Dennis, supra*, 786 F.2d at pp. 1038-1039.) Although the

instructions permitted the jury to convict the defendants of a conspiracy not involving heroin or cocaine, the court concluded that the record did not support this interpretation of the verdict. The court pointed to the lack of any evidence that the conspiracy was limited to the distribution of marijuana and instead noted the overwhelming evidence of a massive conspiracy to distribute all three drugs. Moreover, in connection with the conspiracy, the two defendants were also convicted of committing substantive offenses involving heroin and cocaine. In sum, the court found it "clear *beyond a reasonable doubt* that, as the district court concluded, the jury by its verdict found appellants to have joined a conspiracy to distribute heroin and cocaine." (*Id.* at p. 1040, italics added.) The court cautioned, however, that "it will be a rare case indeed in which instructions like those given in this case will not result in an ambiguous verdict if evidence relating to both marijuana and heroin or cocaine is introduced and the jury is not asked to indicate expressly which drugs it finds the defendants to have conspired to distribute. This is because the reviewing court in such a situation may not examine the evidence presented at trial to determine whether the jury, if properly instructed, *could* have or even *should* have found a heroin/cocaine conspiracy and returned a verdict indicating as much; rather, the court's inquiry is confined to determining beyond any reasonable doubt whether the jury *did* find such a conspiracy and whether it intended the verdict it returned to reflect that determination. *Only in that manner may we avoid invading the special province of the jury in a criminal case both to find the facts and apply the law as it sees fit.*" (*Id.* at p. 1041, original italics and italics added.)

In *U.S. v. Melvin, supra,* 27 F.3d 710, the defendants were convicted of numerous crimes, including carrying a firearm in committing violent crime. There was evidence the defendants used several different firearms, from handguns to machine guns. Because the sentence for the offense varied if the firearm was a machine gun—30 years if it was; five if not—the jury should have been given a special verdict to identify the firearm. However, none was given. After the jury returned a general verdict, the court imposed five-year terms because it was unable to determine whether the jury found the defendants carried a machine gun. On appeal, the government argued that notwithstanding the general verdict, the evidence and argument by counsel established that the jury must have found that the defendants used all of the weapons, including the machine gun, and therefore the court should have imposed 30-year terms. The court of appeals acknowledged that such a finding was plausible. However, citing *Dennis,* the court explained that its task was "not to determine whether the evidence and argument *could* support the government's interpretation of the jury's verdict, but whether it *inevitably must lead* to such a construction." (*U.S. v. Melvin,* at p. 714, original italics and italics added.) Turning to the evidence, the court could not

exclude beyond a reasonable doubt the possibility that the jury rendered a guilty verdict based on a finding that the defendant used only a handgun. (*Id.* at p. 715.) In particular, the court concluded that "the jury's verdict fails to establish, beyond a reasonable doubt, that the jurors found that the defendants violated [the applicable statute] through use of weapons subject to a term of imprisonment greater than five years." (*Ibid.*)

*Dennis* and *Melvin* involved the determination of a whether the jury found a collateral fact related to sentencing and not whether it found a statutory element of the offense. However, if, as those courts concluded, the federal standard governed the former determination, we believe it must govern the more fundamental determination of what act the jury convicted the defendant of committing.

We also reiterate that a defendant's federal constitutional right to a jury trial requires the trial court to accept the *jury's* determination concerning the factual bases for its verdicts. It follows that a court's failure to do so constitutes error of federal constitutional dimension, subject to review under the strict federal standard. Therefore, to prevent such error from occurring in the first place, we consider it appropriate and necessary for the court to use the federal standard when it attempts to discern the factual bases for multiple convictions.

We now turn to the standard for reviewing a trial court's determination. Again, both parties agree that review on appeal is de novo. The People argue that because a trial court's authority to make findings that affect the length of a sentence is limited (see *Apprendi v. New Jersey, supra,* 530 U.S. 466; fn. 6, *ante*), the trial court's determination is not simply a question of fact, subject to deferential review under the substantial evidence test; rather, "the sentencing court must determine *as a matter of law* which criminal acts the jury used as the basis for its convictions, and an appellate court must review that ruling de novo." Defendant argues that since the trial court applies a legal standard to a given set of facts, the determination is legal, subject to independent review. We agree with both parties.

We recognize that there is a factual aspect to a determination concerning the basis of a verdict. The trial court must find what possible unlawful acts shown at trial could have formed the bases for the jury's verdicts. However, this determination is based solely on the evidence introduced at trial. Once evidence of an unlawful act is identified, the issue becomes a legal question: is that evidence sufficient to support a finding of guilt beyond a reasonable doubt. (See *Jackson v. Virginia* (1979) 443 U.S. 307, 318-319 [99 S.Ct. 2781, 2788-2789, 61 L.Ed.2d 560]; *People v. Johnson* (1980) 26 Cal.3d 557,

576-578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) When the trial court has identified those unlawful acts for which there is substantial evidentiary support, its determination concerning the bases for verdicts must also rest on the record: Does the record establish beyond a reasonable doubt which particular acts the jury selected as the bases for its verdicts? For this determination, the court may consider not only the evidence of unlawful acts but also the arguments of counsel and any relevant findings the jury might have made on other charges or enhancement allegations. On the other hand, the trial court's subjective views about the weight of the evidence and the credibility of the witnesses at trial are not relevant because those issues were matters for the jury to determine. (See *People v. Johnson, supra,* 26 Cal.3d at pp. 576-577; Evid. Code, § 312.)

Because, in general, the record produced at trial will be undisputed, the People assert that ". . . a reviewing court is as competent as a trial court to determine the factual basis the jury used for its verdicts." We agree and conclude that whether the record reveals beyond a reasonable doubt the factual bases for the jury's verdicts constitutes primarily a question of law, subject to de novo review on appeal. (See *People v. Mickey* (1991) 54 Cal.3d 612, 649 [286 Cal.Rptr. 801, 818 P.2d 84] [conclusion of a trial court on a pure question of law is subject to independent review]; *People v. Schoenfeld* (1980) 111 Cal.App.3d 671, 681 [168 Cal.Rptr. 762] [where facts undisputed, issue becomes question of law].)

### C. *Determining the Factual Basis for the Jury's Verdicts*

As noted, defendant argues that it is not possible to determine beyond a reasonable doubt which of the numerous unlawful acts supported by substantial evidence the jury used to convict him of the 10 counts charged in the information. According to the People, the court properly found that only two of the 10 convictions were based on acts of March 2. We reject the People's position and agree with defendant.

The People summarize the testimony of Latisha Marshall, the investigating detective, who interviewed the victim. She told Marshall that *before* March 2, she touched defendant on the way to and from the store one day and on the way to and from a visit to some friends. She said she orally copulated him in the car while they ran an errand one day. She touched him in the ravine near her house, and she touched him at home in the living room and also in the kitchen. The victim also said that on March 2, while in the car, defendant asked her to touch and orally copulate him. She touched him, and he digitally penetrated her. The victim did not tell Marshall that she orally copulated defendant at that time; nor did she say how many times he

penetrated her. Thus, according to the People, Marshall related at least 10 acts.

Next, the People summarize the victim's trial testimony. According to the People, the victim described only six acts in places other than a car: a touching in the ravine near her house; a touching in the woods farther away; two touchings in the victim's room; a touching in the living room; and a touching in the kitchen. The People further assert that the victim related five or six acts *in the car on March 2*: a touching and four or five digital penetrations.

The People assert that the victim's enumeration of acts to Marshall and the victim's trial testimony were "consistent in describing the ten instances of molestation relied on by the prosecutor," which included only two acts in the car on March 2: masturbation and one digital penetration. They argue that the *additional* acts of molestation on March 2 were not "more worthy of belief" than any of the pre-March 2 incidents she described both to Marshall and the jury. On the contrary, they argue that evidence of the pre-March 2 acts was "more credible" than evidence of "additional March 2 incidents" because the victim's testimony about the former was "certain and specific" and her testimony about the latter was "equivocal and non-specific." The People also point out that defense counsel did argue that the victim's testimony about the additional March 2 acts was more credible than the evidence of pre-March 2 acts. Moreover, the prosecutor specifically argued that defendant committed the 10 related by Marshall.

Given the victim's corroborated, consistent, and specific testimony about the pre-March 2 acts; the lack of corroboration, consistency, or specificity in the victim's testimony about *additional* acts on March 2; the lack of argument by the defense favoring those additional acts over the pre-March 2 acts; and the prosecutor's reliance on Marshall's list of acts, the People argue that the jury had "no rational basis" to reject any of the eight pre-March 2 acts related by Marshall and base more than two verdicts on the additional acts of March 2. Indeed, given the presumption that juries act reasonably (see *People v. Guiton* (1993) 4 Cal.4th 1116, 1127 [17 Cal.Rptr.2d 365, 847 P.2d 45]), the People submit that the jury did not do so. Thus, although there may be substantial evidence defendant committed more than two acts on March 2, no reasonable jury would or could have based any more than two convictions on acts occurring on March 2.

We do not find the People's analysis and argument persuasive for several reasons.

Initially, we observe that the People's claim is based in part on their assessment of the weight and credibility of evidence supporting the pre-March 2 acts and the additional March 2 acts. According to the People, the

evidence of acts which the victim described twice—i.e., that she related to Marshall and again at trial—is more credible than evidence of acts which she related only at trial. Although this view is not unreasonable, neither the People nor we have any way of knowing how the jury weighed Marshall's and the victim's testimony. Moreover, unlike the People, the jury was able to consider not only the witnesses' testimony, but also their manner and demeanor when it assessed weight and credibility. Thus, we consider the persuasive value of the People's assessment limited.

Next, the People's summary of the *victim's* testimony concerning the total number of acts is not entirely accurate. According to the People, the victim related 11 or 12 acts. As noted, however, the victim also testified about two acts of oral copulation in the house and one in the car. Thus, the victim related at least 14 or 15 acts.

Furthermore, we do not agree that at trial the victim specifically and consistently corroborated the 10 acts related by Marshall. For example, according to the People, Marshall related an act of oral copulation in the car *before* March 2. The victim did testify about one act of oral copulation in the car but said it occurred *on March 2*. Similarly, Marshall testified about four touchings in the car: on the way to and from a store and to and from visiting some friends. However, at trial, the victim did not specifically describe any of these touchings. She testified generally that she touched defendant in the car "a lot" and "more times" than in the house and then went on to describe the touchings in places other than a car and the touching in the car on March 2.

The record also does not support the People's view that Marshall's testimony about when the oral copulation and four pre-March 2 touchings occurred was more certain, specific, and credible than the victim's testimony about when the oral copulation occurred and how many times he digitally penetrated her. In this regard, we find that although the victim equivocated concerning whether there were four *or five* penetrations, her testimony reflects substantial certainty that there were four. We also point out that Marshall did not directly or necessarily contradict the victim's testimony about the number of penetrations. Although she may not have told Marshall that defendant penetrated her more than once, the record does not reflect that Marshall asked the victim how many times he did so; nor did she ask the victim to clarify discrepancies between the number of acts she described to Marshall and the number she had previously related to others. Moreover, Marshall testified that in general, children do not comprehend numbers very well; they can remember more acts with the passage of time; and sometimes they reveal additional information as they feel more comfortable.

Next, the People's reliance on the lack of argument by defense counsel and on the prosecutor's closing argument is misplaced. Although defense counsel may not have argued that the evidence of additional March 2 acts was more credible than the evidence of the pre-March 2 acts, he also did not argue that it was any less credible. In any event, the People's observation is irrelevant because defendant claimed, in essence, that none of the acts the victim related to Marshall or at trial took place. (See *Coelho I, supra,* H017064.) Moreover, although the prosecutor relied on Marshall's list of acts, doing so does not suggest that the victim's testimony about additional March 2 acts was less credible. Indeed, in their brief, the People candidly acknowledge that "the prosecutor also told the jury that appellant touched [the victim] repeatedly with his finger during the March 2 incident in the car, that the ten instances the prosecutor specified were only for the 'guidance' of the jury, that the jury did not 'have to use' them, and that 'there were at least *fifteen* acts of inappropriate touching . . . .'" (Italics added, fn. omitted.)

In our view, the prosecutor's argument tends to refute the People's claim, for it implies that the jury could rationally convict defendant of multiple penetrations rather than all of the acts related by Marshall. For example, the jury could have had a reasonable doubt about what the victim told Marshall concerning the four touchings that allegedly occurred going to and from a store and some friends' house because the victim did not specifically corroborate them at trial. On the other hand, the jury could have given greater credence to the victim's trial testimony concerning additional March 2 acts because it was given under oath and not contradicted by what Marshall said.[8]

In sum, the record does not clearly reveal what a reasonable jury would or could have found, let alone establish beyond a reasonable doubt that it could only have based two convictions on acts of March 2.

In their supplemental brief, the People take a slightly different approach. They ask us to apply an analysis courts use to resolve a claim of error based on the failure to give a unanimity instruction. In such cases, for example, when a defendant is charged with one count and there is substantial evidence of more than one act, the failure to give a unanimity instruction may be deemed harmless (or no error at all), if the reviewing court finds that the jury had no rational basis to distinguish among the various acts shown. Under such circumstances, the evidence poses an all-or-nothing option: either the defendant committed all of the acts or none of them. Thus, a reviewing court

---

[8]The People concede that the victim's testimony about additional March 2 acts was sufficient to support multiple convictions. We agree. However, given the victim's equivocation about whether there were four or five penetrations, we find her testimony to be substantial evidence of only four, not five, acts.

may reasonably conclude that in finding the defendant guilty, the jurors did not disagree about the defendant's conduct and therefore that their verdict must have been unanimous. (See *People v. Jones* (1990) 51 Cal.3d 294, 307 [270 Cal.Rptr. 611, 792 P.2d 643]; *People v. Diedrich* (1982) 31 Cal.3d 263, 282-283 [182 Cal.Rptr. 354, 643 P.2d 971]; *People v. Brown* (1996) 42 Cal.App.4th 1493, 1500 [50 Cal.Rptr.2d 407]; e.g., *People v. Carpenter* (1999) 21 Cal.4th 1016, 1058 [90 Cal.Rptr.2d 607, 988 P.2d 531] [failure to give instruction harmless]; *People v. Carrera* (1989) 49 Cal.3d 291, 311-312 [261 Cal.Rptr. 348, 777 P.2d 121] [failure to instruct not error]; *People v. Melhado* (1998) 60 Cal.App.4th 1529, 1539 [70 Cal.Rptr.2d 878] [failure to instruct prejudicial]; *People v. Castaneda* (1997) 55 Cal.App.4th 1067, 1070-1071 [64 Cal.Rptr.2d 395] [same].)

The People assert a variation of this analysis. They argue that here "the jury could not reasonably have found that [defendant] committed the 'same occasion' lewd acts on March 2 without also finding that he committed the eight separate acts that allegedly occurred before March 2. Accordingly, the jury verdicts were based on a finding of nine separate occasions, and the trial court was required to consider a concurrent sentence for only one of the ten counts." We do not find the all-or-nothing analysis of help in determining the bases for the jury's verdicts.

Initially, we observe that when a defendant claims a verdict may not have been unanimous, the all-or-nothing analysis can adequately resolve the issue because it is enough to say that whatever act the jury selected, the jurors must have unanimously agreed that the defendant committed it. However, for the purposes of sentencing, the all-or-nothing analysis does not necessarily resolve ambiguity concerning which particular act the jury intended to base its verdict on. That there may be no rational basis for the jury to distinguish among numerous acts revealed at trial does not establish that in reaching their verdict the jury actually and specifically found that the defendant committed every act. A jury may proceed chronologically through the acts shown and, when they run out of counts to convict the defendant of committing, stop considering any other acts.

Furthermore, even if a reviewing court can reasonably conclude that the jurors must have found that the defendant committed all of the acts shown at trial, a troubling question remains: May the court then freely assign any act it wants to each conviction, even though the punishment may vary drastically depending on which acts it chooses? The People assume that the court may properly do so because the jury's findings on whichever acts the court does not select become, in essence, "surplusage."

We need not reach the issue here because we do not agree with the People that if the jury found the additional March 2 acts, it could not have rejected

any of the pre-March 2 acts. As discussed above, the People's assessment of the evidence implies that the jury could have reasonably distinguished between the pre-March 2 acts and the additional March 2 acts and found the former but not the latter. We agree that the jury could reasonably distinguish between these two sets of acts but find that the jury could reasonably reject some of the former in favor of the latter. Thus, we must reject the People's reliance on a unanimity-case approach because it does not help resolve the ambiguity that surrounds the factual bases for the jury's verdicts. (Cf. *United States v. Dennis, supra,* 786 F.2d 1029 [approach used], and *U.S. v. Melvin, supra,* 27 F.3d 710 [approach rejected].)

### D. Determining the Scope of the Trial Court's Discretion

In *People v. Hall, supra,* 67 Cal.App.4th 128, the court explained that once a determination of guilt has been made, the trial court reviews the relevant evidence concerning the unlawful acts the defendant was convicted of and determines whether they occurred on the same or different occasions and under the same or different circumstances. "If following further hearing, there still is no evidence from which the trial court can determine that the crimes occurred 'on the same occasion' *and* arose 'from the same set of operative facts' the court is not required to impose consecutive terms. In that situation, the trial court must exercise its discretion to impose concurrent or consecutive terms. The law deprives the trial court of discretion and requires consecutive sentencing only if the current crimes arose on different occasions and out of different sets of operative facts. It is of no import that the record fails to reveal whether or not the offenses occurred 'on the same occasion' if the evidence supports the court's determination that the offenses arose 'from the same set of operative facts.' For the same reason, if the offenses occurred 'on the same occasion,' it does not matter whether there is evidence that they did or did not arise from the same set of operative facts. Under these circumstances, the court retains *discretion* under ordinary sentencing principles to decide whether to impose consecutive or concurrent terms." (*Id.* at pp. 138-139, original italics.)

Notwithstanding the ambiguity concerning the factual basis for each verdict, the victim's testimony constituted substantial evidence of at most six acts on March 2. (See fn. 8, *ante.*) Thus, we can deduce beyond a reasonable doubt that at least four of the 10 verdicts were based on acts that occurred *before* March 2. Moreover, given the evidence of all of the pre-March 2 acts, we note that any combination of four acts would reflect offenses that

occurred on different occasions and under different circumstances.[9] (Cf. *People v. Deloza, supra,* 18 Cal.4th at p. 595 [same occasion], with *People v. Lawrence, supra,* 24 Cal.4th 219 [different occasions].)

Thus, we focus on six convictions, for which it is not reasonably possible to discern the factual bases. *Hall* indicates that when the court knows what the unlawful acts are but cannot determine whether they occurred on different occasions and under different circumstances, consecutive sentences are not mandatory. As we explain below, we conclude, consistent with *Hall,* that where, as here, a court is unable to determine beyond a reasonable doubt which unlawful acts among many the jury based its verdicts on, the court for the purposes of sentencing should assume the factual bases that would provide the most discretion.

It has long been judicial policy to give the defendant " 'the benefit of every reasonable doubt, whether it arise out of a question of fact, or as to the true interpretation of words or the construction of language used in a statute.' " (*People v. Ralph* (1944) 24 Cal.2d 575, 581 [150 P.2d 401], quoting from *Ex parte Rosenheim* (1890) 83 Cal. 388, 391 [23 P. 372]; accord, *People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 312 [58 Cal.Rptr.2d 855, 926 P.2d 1042]; see *United States v. Bass* (1971) 404 U.S. 336, 347 [92 S.Ct. 515, 522, 30 L.Ed.2d 488] [" '[A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity' "].) We see this rule of lenity applied most often in the construction of penal statutes. Thus, " '[w]hen language which is susceptible of two constructions is used in a penal law, the policy of this state is to construe the statute as favorably to the defendant as its language and the circumstance of its application reasonably permit. The defendant is entitled to the benefit of every reasonable doubt as to the true interpretation of words or the construction of a statute.' " (*People v. Snyder* (2000) 22 Cal.4th 304, 314 [92 Cal.Rptr.2d 734, 992 P.2d 1102], quoting *People v. Overstreet* (1986) 42 Cal.3d 891, 896 [231 Cal.Rptr. 213, 726 P.2d 1288].) This rule applies to statutes that govern sentencing. (See, e.g., *People v. Henson* (1997) 57 Cal.App.4th 1380 [67 Cal.Rptr.2d 734] [resolving ambiguities in statutes governing presentence custody credit]; *People v. Hill* (1995) 37 Cal.App.4th 220 [44 Cal.Rptr.2d 11] [same].) Consequently, for the purpose of determining the scope of a trial court's sentencing discretion, we consider it appropriate to apply the rule of lenity to resolve ambiguity concerning the factual bases for convictions. Moreover, doing so is not clearly unfair to the People. Here, the prosecutor could have elected to rely on only those 10 acts

---

[9]On appeal, defendant requests a remand so the trial court can exercise discretion over *seven* convictions. In doing so, he implicitly concedes that at least three terms were mandatory.

related by Marshall. However, in declining to do so and seeking convictions based on any of the acts shown at trial, the prosecutor was partly responsible for the ambiguity of the verdicts. Defendant, on the other hand, did not contribute to the ambiguity. Thus, as between the People and defendant, we consider it more reasonable to give defendant the benefit of the doubt concerning the factual bases for the verdicts.

Here, we find ambiguity concerning the bases for six convictions. Because they could have been based on the six acts committed on March 2 and because this view would have afforded the most sentencing discretion, we conclude that the trial court should have adopted this view and exercised discretion over more than two convictions.

At this point, we postpone further discussion concerning the court's failure to exercise discretion until after we resolve defendant's claim that the court abused its discretion in imposing consecutive sentences for two March 2 convictions.

### V. *Adequacy of Reasons for a Consecutive Sentence*

The trial court must "state the reasons for its sentence choices on the record at the time of sentencing." (§ 1170, subd. (c).) Where the court has discretion, the imposition of a consecutive, rather than concurrent, term represents a sentencing choice. (Cal. Rules of Court, former rule 406(b)(5) [now rule 4.406]; see *People v. Belmontes* (1983) 34 Cal.3d 335, 347-348 [193 Cal.Rptr. 882, 667 P.2d 686]; *People v. Senior* (1992) 3 Cal.App.4th 765, 781 [5 Cal.Rptr.2d 14].)[10] Former rule 425 (now rule 4.425) sets forth the criteria affecting the decision to impose consecutive rather than concurrent terms, and these criteria included whether or not "(1) The crimes and their objectives were predominantly independent of each other. [¶] (2) The crimes involved separate acts of violence or threats of violence. [¶] (3) The crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior." The rule also incorporates as criteria "[a]ny circumstances in aggravation or mitigation" with certain exceptions not applicable here. (Former rule 425(a) & (b); see former rules 421 & 423 [now rules 4.421 & 4.423] [listing circumstances in aggravation and mitigation].)

In imposing consecutive sentences, the court noted that the touching and digital penetration were "separate and distinct" and defendant had time "for thought in between."

The parties agree that the trial court imported a concept—time to reflect— from section 667.6, subdivision (d), which prescribes mandatory full consecutive terms for certain sex offenses "if the crimes involve . . . the same

---

[10]All references to rules are to the California Rules of Court.

victim on *separate occasions*." (Italics added.) That section specifically defines "separate occasions" as follows: "In determining whether crimes against a single victim were committed on separate occasions . . . , the court shall consider whether, between the commission of one sex crime and another, the defendant had *a reasonable opportunity to reflect* upon his or her actions and nevertheless resumed sexually assaultive behavior. Neither the duration of time between crimes, nor whether or not the defendant lost or abandoned his or her opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions." (Italics added.)

The parties also agree this definition of "separate occasions" provides only "marginal assistance" in determining whether consecutive sentences are mandatory under the Three Strikes law, that is, whether they occurred on the same occasion. (*People v. Deloza, supra*, 18 Cal.4th at p. 599.) However, the People argue, and we agree, that although the statutory definition of *separate occasion* has little bearing on whether consecutive terms for one of the March 2 acts was mandatory, the fact that defendant had time to reflect between the act of masturbation and digital penetration was relevant in determining whether to impose a consecutive or concurrent term because having time to reflect may reasonably be considered an aggravating factor.[11] (See former rule 425(b).)

Moreover, the court's reasoning also reflects the sentencing factor set forth in former rule 425(a)(1): "[t]he crimes and their objectives were predominantly independent of each other." Having the victim masturbate him and then digitally penetrating her reflect separate and different types of acts that are predominantly independent of each other, in that neither was merely incidental to or the necessary means of committing the other.

In addition, although defendant asserts that both acts reflect the same objective—sexual gratification—we do not believe that such a broad view of a perpetrator's objective should invariably determine whether the objectives of numerous sex crimes were predominantly independent of each other. In a different sentencing context, courts have rejected the defendant's reliance on a general desire for sexual gratification to argue that multiple terms for numerous sexual acts violates the proscription against multiple punishment in section 654. Even though each act may share such a general motivation, courts conclude that multiple punishment is proper. (See *People*

---

[11]We reject defendant's claim that the court's use of terminology from section 667.6 suggests it was unaware of or confused about the applicability of former rule 425 and the criteria for selecting a consecutive sentence. In exercising its discretion, the court expressly referred to former rule 425.

*v. Nubla* (1999) 74 Cal.App.4th 719, 730-731 [88 Cal.Rptr.2d 265].) As the California Supreme Court observed, "[S]uch a 'broad and amorphous' view of the single 'intent' or 'objective' needed to trigger [section 654] would impermissibly 'reward the defendant who has the greater criminal ambition with a lesser punishment.' [Citation.] Rather, in keeping with the statute's purpose, the proper view [is] to recognize that a 'defendant who attempts to achieve sexual gratification by committing a number of base criminal acts on his victim is substantially more culpable than a defendant who commits only one such act.'" (*People v. Harrison* (1989) 48 Cal.3d 321, 335-336 [256 Cal.Rptr. 401, 768 P.2d 1078].)

■ Moreover, in our view, the factors enumerated in former rule 425 reflect a policy that greater culpability warrants consecutive terms. Here, the court could reasonably find that the objectives behind the touching and digital penetration were separate and distinct: to achieve different forms of sexual gratification, first by being passive and having the victim manipulate his genitals; and then by being active and penetrating her genitals. In this respect, the court's finding that defendant had time to reflect between the two acts further indicates that he consciously entertained different sexual objectives. Moreover, in electing to digitally penetrate the victim, defendant caused her to suffer a violation that was different, and more physically intrusive, than having her touch him. In our view, therefore, a defendant who decides to commit different types of sexual acts—e.g., digital penetration, oral copulation, and sodomy—may reasonably be deemed more culpable than a person who repeats one of those acts three times, perhaps in rapid succession without much thought.

In sum, we conclude that the court stated an adequate reason for imposing consecutive sentences for two of the March 2 acts. (See *People v. Bravot* (1986) 183 Cal.App.3d 93, 98 [227 Cal.Rptr. 810] [only one criterion or factor in aggravation is necessary to support a consecutive sentence].)

## VI. *Remand for Resentencing*

As our discussion so far reveals, of 10 consecutive terms, six are proper: four based on pre-March 2 acts, which were mandatory; and two based on March 2 acts, over which the trial court exercised discretion and provided adequate reasons. Thus, we must decide whether remand is necessary for resentencing concerning the four remaining convictions: three digital penetrations and one act of oral copulation. Under the unique circumstances of this case we think not.

We first note that since all six March 2 acts occurred on a different day than the four pre-March 2 acts, a consecutive sentence for one March 2 act

is mandatory. Concerning the need to remand for the court to exercise discretion over three convictions, we next note that in addition to the court's reliance on the difference between the acts of masturbation and digital penetration, the record reflects the existence of numerous other aggravating circumstances applicable to each of the March 2 acts. Defendant's relationship with the victim reveals that he took advantage of a position of trust. (Former rule 421(a)(11).) He perpetrated the offenses by taking the victim for a ride in the car, purporting to run an errand. Doing so indicates not only that he planned the offenses but also that the victim was particularly vulnerable alone with him in the car. (Former rule 421(a)(8) & (3).) Furthermore, defendant has previously served a prison term. (Former rule 421(b)(3).) Finally, the court did not expressly find any mitigating circumstances.

Given the court's decision to base a consecutive sentence on the difference between the act of masturbation and the act of digital penetration, it is inconceivable the court would impose a concurrent term for an act of oral copulation, yet another different type of sexual act committed with the victim. This is especially so given the availability of numerous other aggravating factors and the fact that twice the court has found no mitigating factors and imposed 10 consecutive sentences. For these additional reasons, we also find it inconceivable that the court would impose concurrent terms for any of the other acts of digital penetration. Indeed, during the course of the remand hearing, the court stated that it would impose consecutive sentences even if it had discretion over all 10 convictions.

Where sentencing error involves the failure to state reasons for making a particular sentencing choice, including the imposition of consecutive terms, reviewing courts have consistently declined to remand cases where doing so would be an idle act that exalts form over substance because it is not reasonably probable the court would impose a different sentence. (See, e.g., *People v. Williams* (1996) 46 Cal.App.4th 1767, 1783 [54 Cal.Rptr.2d 521]; *People v. Sanchez* (1994) 23 Cal.App.4th 1680, 1686 [29 Cal.Rptr.2d 367]; *People v. Adams* (1990) 224 Cal.App.3d 705, 709 [274 Cal.Rptr. 94]; *People v. Porter* (1987) 194 Cal.App.3d 34, 39 [239 Cal.Rptr. 269]; *People v. Preyer* (1985) 164 Cal.App.3d 568, 577 [210 Cal.Rptr. 807]; *People v. Blessing* (1979) 94 Cal.App.3d 835, 838-839 [155 Cal.Rptr. 780].) Although this case involves a misunderstanding concerning the scope of the discretion (see, e.g., *People v. Deloza, supra,* 18 Cal.4th at p. 600), we nevertheless consider a remand here to be an idle and unnecessary, if not pointless, judicial exercise. The trial court has twice imposed 10 consecutive sentences and indicated that it would impose them even if some were not mandatory. Moreover, the record reflects numerous grounds to support consecutive

sentences, any one of which would be sufficient by itself. Under these circumstances, we consider it virtually certain the court would impose 10 consecutive sentences if we remanded the matter. (See *People v. Bravot, supra*, 183 Cal.App.3d 93, 98.) Consequently, we decline to do so.

### VII. *Disposition*

The judgment is affirmed.

Premo, Acting P. J., and Bamattre-Manoukian, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 19, 2001. Chin, J., did not participate therein.