Filed 9/25/13  P. v. Cabrera CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>v.<br><br>MIGUEL CABRERA,<br><br>　　Defendant and Appellant. | H037730<br>(Santa Clara County<br>Super. Ct. No. F1036388) |

On July 15, 2011, the Santa Clara County District Attorney filed an information in which Miguel Cabrera (appellant) was charged with three counts of aggravated sexual assault on a child under 14 years of age (Pen. Code, § 269, counts one through three);[1] six counts of lewd or lascivious acts upon a child by force, violence, duress, menace or fear (§ 288, subd. (a)(1), counts four through nine (forcible lewd acts));[2] and rape by force, violence, duress, menace or fear (§ 261, subd. (a)(2), counts 10 through 13).  Following approximately three days of trial testimony, the jury found appellant guilty of counts one and three, five through nine and 10 through 13.  The jury found him not guilty of counts two and four.

---

[1]　　The three counts of aggravated sexual assault were based on allegations of forcible rape in count one, forcible penetration with a foreign object in count two and forcible oral copulation in count three.

[2]　　All unspecified section references are to the Penal Code.

Subsequently, on December 5, 2011, the trial court imposed a determinate prison term of 54 years (full term consecutive sentences for counts five through 13) and a consecutive indeterminate term of 30 years to life (15 years to life for both counts one and three).

Appellant filed a timely notice of appeal. On appeal, appellant raises seven issues. First, he challenges the sufficiency of the evidence of force as it pertains to counts five through nine—forcible lewd acts with a child under the age of 14. Second, appellant contends that all the counts involving force—counts four through nine (lewd acts), count one (aggravated sexual assault based on forcible rape) and counts 10 through 13 (forcible rape) must be reversed because the trial court failed to instruct on lesser included offenses. Third, appellant argues that the trial court erred by failing to instruct the jury on how to consider circumstantial evidence of facts other than his mental state. Fourth, the trial court erred in admitting evidence of Child Sexual Abuse Accommodation Syndrome (CSAAS) because there was no evidence that the jurors needed to be disabused of any misconceptions; and by instructing the jurors that they could use the testimony in considering the victim's testimony. Fifth, appellant argues that considered cumulatively all the foregoing errors violated his right to a fair trial. Sixth, the trial court violated his Sixth Amendment right to counsel when it failed to conduct a *Marsden* Hearing.[3] Finally, appellant contends that the trial court erred by imposing consecutive sentences for counts one and three.

Appellate counsel has filed a petition for writ of habeas corpus, which this court ordered considered with the appeal. In his writ petition, Cabrera argues that he was deprived of the effective assistance of counsel because his attorney failed to move to suppress statements he made when he was interviewed by police officers. In addition, his trial counsel was ineffective in failing to present expert testimony that would have

---

[3]     *People v. Marsden* (1970) 2 Cal.3d 118.

demonstrated that he does not have the psychological character of a person who would commit the offenses charged in this case. We have disposed of the habeas petition by separate order filed this day. (See Cal. Rules of Court, rule 8.387(b)(2)(B).)

For reasons that follow, we affirm the judgment.

*Facts*

*The Prosecution's Case*

Jane Doe is appellant's stepdaughter.[4] Appellant married Jane's mother when Jane was seven years old. In November 2010, Jane was 17 years old.

On November 19, 2010, Jane went to the Gilroy Police Department after she ran away from home. Officer John Ballard testified that when he interviewed Jane on November 19, she appeared to be "shaken up" and was withdrawn and quiet. Jane told Officer Ballard that she had been molested by her stepfather starting when she was eight or nine years old. Appellant started by rubbing her breast and vagina on almost a daily basis until she was 13 years old and started menstruating. At that time, appellant started having intercourse with her; however, prior to intercourse appellant would lick Jane's vagina, rub her and then have intercourse. Jane estimated that this happened at least 15 times when she was 13 and continued until she was 17. Jane told Officer Ballard that appellant forced her, other times she would "just go along with it for fear of getting hit." Jane said that appellant had slapped her in the past.[5]

Officer Ballard had Jane make a pretext telephone call to appellant. During the telephone call Jane told appellant that she thought she might be pregnant and that it was by him. After a pause, appellant responded, "No, no, no, no." Appellant did not admit or deny the implication that he had had sexual intercourse with Jane.[6]

---

[4]     We refer to the victim in this case as Jane or Jane Doe to protect her anonymity.
[5]     During Jane's trial testimony, after she identified her own voice, a recording of Jane's interview with Detective Ballard was played for the jury and moved into evidence.
[6]     A recording of the pretext telephone conversation was played for the jury.

Officer Ballard interviewed appellant on the night of November 19 at the Gilroy Police Station. Initially, appellant denied that he had sexually molested Jane. However, after the officer used a ruse—he asked appellant why his DNA would have been found inside Jane—appellant told the officer that a month earlier Jane "came on to him" and they had consensual sex until he realized that it was wrong and he stopped. Officer Del Moral testified that during the interview appellant appeared calm and was cooperative; appellant even laughed a couple of times.[7]

Gilroy Police Corporal Rosa Quinones interviewed Jane initially. Jane told her that appellant started sexually molesting her when she was eight or nine years old. Appellant touched her vagina until she turned 13 and then he started having intercourse with her. Jane told her that she did not want to have intercourse with appellant; she did not like it. On one occasion, appellant slapped her because she said no, but he had intercourse with her anyway.

At trial, Jane testified that appellant never touched her inappropriately. She admitted that in November 2010, she said that appellant had sexually molested her. She acknowledged that on the day after she ran away she told her friend and her boyfriend that she had suffered sexual abuse since she was seven or eight. However, she testified that she made up the story because she wanted her freedom and was mad at appellant for taking away her cellular telephone. Jane admitted that she told the police that appellant had sexually abused her for years. In addition, she acknowledged that she feared if she told anyone what had happened appellant would be locked up, her mother would lose her husband and her family would lose appellant's financial support.

Jane listened to appellant's statement to the police where he admitted that he put his penis into Jane's vagina before he realized that it was wrong. Jane continued to deny that anything had happened. On cross examination Jane said that the first time she said

---

[7]   Portions of the video recording of appellant's interview were played for the jury during Jane's trial testimony.

4

that the accusations were false was when she testified at the preliminary hearing held on July 8, 2011, but she told her social worker that she had made up the accusations before then. Jane said that she needed help to stop lying.

During her testimony, Jane stated that appellant would beat her if she did not listen; this started when she was about eight years old. Appellant would use a looped belt to hit her on her behind or sometimes her back or legs. Jane said that appellant had only slapped her once by accident. Jane denied that appellant had slapped her about two weeks before she ran away, but acknowledged that was what she had told the police. Jane said that she had tried to run away before, but appellant and her mother would always stop her from leaving.

Jane's mother testified that Jane ran away from home on November 18, 2010, after an argument about doing chores. The following day, Jane's mother reported her missing to the police. According to Jane's mother, before Jane ran away, her daughter never told her that anything inappropriate had happened between her and appellant. Jane's mother did not believe that the accusations were true. She said that Jane was a liar and although Jane was strong-willed, she believed that someone pushed Jane into making false accusations. Jane's mother stated that even if appellant had admitted that he had sex with Jane and touched her breasts, she would still believe that Jane was a liar. Jane's mother said that Jane never appeared to be afraid of appellant. Jane was expected to do a large amount of chores. However, as she got older she began to resist doing them. Jane began to complain that her parents did not let her go out with her friends; Jane would often lie to escape her responsibilities or to avoid punishment.

Jane's mother testified that on November 18, 2010, Jane refused to do her cleaning chores. Consequently, appellant instructed her to take away Jane's cellular telephone. Initially, Jane refused to give up the telephone, but eventually she threw it or handed it angrily to her. Then, Jane began to clean the bathroom and kitchen. When she was done,

5

Jane was still angry, which caused her three year old sister to cry. Appellant told Jane to go to the living room. Instead, Jane left the house.

Jane's mother and appellant knew that Jane was dating a boy who was 17 years old. They retrieved his telephone number from Jane's telephone and went to his house to look for her.

Jane's boyfriend testified that on November 19 he met with Jane and she told him she had run away from home because of something that had happened with her stepfather. Jane said that her stepfather had raped her and it started around the time she was 13 years old. Jane's boyfriend testified that it was his father that took Jane to the Gilroy Police Station.

As noted, a recording of Jane's interview was played for the jury. In the interview Jane told the police that appellant would touch her vagina on almost a daily basis until she was 13. After she was 13, appellant started having intercourse with her at least twice a week; she described a routine that occurred every time appellant had intercourse with her. The incidents would occur when her mother was not home. Appellant would call her over, start touching her breasts and vagina and then take off her clothes; appellant would orally copulate her almost every time they had intercourse. After he took off her clothes, appellant would make her lie down, then, he would take off his clothes, get on top of her, start kissing her, and have intercourse with her. Sometimes appellant would use a condom, but sometimes not. Appellant assured her that if she ever became pregnant he would "take care of it." Jane said that sometimes she would say no, but appellant would still make her do it. Sometimes he would stop talking to her for days. The last incident happened about two weeks before she left. She had told appellant "no" and he had slapped her. Jane acknowledged that despite her telling appellant to stop, appellant thought she liked it.

6

Carl Lewis testified as an expert on CSAAS that victims of child sexual abuse often delay in reporting the abuse out of fear of the outcome.[8]  Specifically, the child is afraid of what will happen if she tells anyone what has happened including such things as the break-up of her family and anger or violence from the abuser.  Child victims of sexual abuse often retract their accusations.  This is so because the child finds herself in a great deal of chaos after the accusation is made and so the child retracts the accusation in order to make things better or make them return to normal.  As a result of CSAAS, the victim's claim should not be rejected outright because it seems illogical or unbelievable.  Rather it should be accepted and investigated thoroughly; there should be no preconceived ideas about how children react to sexual abuse.

*Defense Testimony*

Doctor Annette Ermshar testified as an expert for the defense that CSAAS was designed for doctors, psychologists and therapists to treat children and not to interrogate the child.  CSAAS is not helpful in determining which children have been sexually abused and which children have not.  Both groups may exhibit the same behavior and sexually abused children may not exhibit any of the CSAAS behavior.  CSAAS is not currently accepted by the scientific community because it does not provide any useful information.  On cross examination Doctor Ermshar acknowledged that some children who have been sexually abused delay reporting the abuse, adapt and survive in that environment and later retract their claim of abuse.

*Discussion*

*I. Sufficiency of the Evidence of Forcible Lewd Acts*

Appellant contends that the evidence was insufficient to support the jury's verdict of guilty on five counts of forcible lewd acts (§ 288, subd. (b)(1)).  Specifically, he argues that there was no evidence that the lewd acts were committed by force or duress.

---

[8]     Before trial the court limited Lewis's testimony to the issues of recantation and delayed reporting.

Accordingly, he asserts that his convictions on counts five through nine cannot stand. We disagree and focus on the duress element of section 288, subdivision (b)(1).[9]

Section 288, subdivision (b)(1) makes it a felony to commit a lewd or lascivious act upon a child under the age of 14 "by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person."

"Duress" means "a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted." (*People v. Pitmon* (1985) 170 Cal.App.3d 38, 50 (*Pitmon*) [disapproved on another ground as stated in *People v. Soto* (2011) 51 Cal.4th 229].)

In determining whether there is sufficient evidence of duress, "the focus must be on the defendant's wrongful act, not the victim's response to it." (*People v. Soto, supra,* 51 Cal.4th at p. 246 (*Soto*).) Our Supreme Court approved the following instruction defining duress. " 'Duress means *the use of* a direct or implied threat of force, violence, danger, hardship, or retribution *sufficient to cause* a reasonable person to do [or submit to] something that he or she would not otherwise do [or submit to]. When deciding whether the act was accomplished by duress, consider all the circumstances, including the age of the child and (his/her) relationship to the defendant.' " (*Soto, supra,* 51 Cal.4th at p. 246, fn. 9.) Such an instruction was given in this case.

Thus, in evaluating a sufficiency-of-the-evidence challenge to a finding of duress, we consider the totality of the circumstances "including the age of the victim, and [the victim's] relationship to [the] defendant." (*Pitmon, supra,* 170 Cal.App.3d at p. 51.)

---

[9]     As this court recognized in *People v. Quinones* (1988) 202 Cal.App.3d 1154, "force" means " 'physical force substantially different from or substantially in excess of that required for the lewd act' . . . ." (*Id.* at p. 1158.) We do not find evidence of force in the evidence in this case.

Physical control over the victim, even if it is insufficient to constitute force may create duress. (*People v. Schulz* (1992) 2 Cal.App.4th 999, 1005.) Other factors include the physical size disparity between the defendant and the victim that may contribute to the victim's sense of vulnerability. (*Pitmon, supra,* at p. 51.) In addition, "the position of dominance and authority of the defendant and his continuous exploitations of the victim" (*People v. Cardenas* (1994) 21 Cal.App.4th 927, 940) are relevant factors in determining whether the sex crime was accomplished through duress. Other relevant circumstances may include threats to harm the victim, physically controlling a resisting victim, and threats of retribution if the victim reveals the molestation. (*People v. Cochran* (2002) 103 Cal.App.4th 8, 14.)

Jane described how appellant would beat her if she did not listen; this started when she was about eight years old. Appellant would use a looped belt to hit her on her behind or sometimes her back or legs. As to the lewd touching, Jane told the police that appellant would touch her vagina on almost a daily basis until she was 13. Appellant was Jane's stepfather and according Jane was approximately 5' 8" and of a heavy build. Even at age 17 Jane was only 5' 4". Given the relationship between appellant and Jane, the size differential that would have existed when Jane was between the ages of eight and 13, appellant's continuous exploitation of Jane and the physical abuse that Jane would suffer if she did not listen to appellant, we conclude that there was sufficient evidence that this was forcible lewd touching in the sense that appellant accomplished all the acts charged by means of duress. Jane acquiesced to all the acts because, as the evidence showed, if she did not appellant would likely beat her with a belt. That is duress. (*People v. Cochran*, *supra*, 103 Cal.App.4th at p. 16 fn. 6. [when the victim is as young as this victim and is molested by her father in the family home, in all but the rarest cases duress will be present].)

Accordingly, we reject appellant's assertion that there was insufficient evidence to support his convictions for forcible lewd acts.

9

*II. Lesser Included Offenses*

Appellant argues that this court must reverse all the counts involving force because the trial court failed to instruct on lesser-included offenses thereby violating his rights to due process under both the federal and California Constitutions.

Specifically, appellant contends that the trial court should have given the jury the option of convicting him of non-forcible lewd acts with a child (§ 288, subd. (a)) in counts four through nine;[10] unlawful sexual intercourse with a minor (§ 261.5, subd. (a)) in counts one and 10 through 13; and non-forcible oral copulation (§ 288a, subds. (b)(2) and (c)(1)) in count three. Appellant asserts that the failure to instruct on these lesser included offenses was prejudicial and requires reversal of all his convictions.

In *People v. Lopez* (1998) 19 Cal.4th 282 (*Lopez*), our Supreme Court stated, "A court must instruct sua sponte on general principles of law that are closely and openly connected with the facts presented at trial. [Citations.] This sua sponte obligation extends to lesser included offenses if the evidence '*raises a question as to whether all of the elements* of the charged offense are present and there is evidence that would justify a conviction of such a lesser offense. [Citations.]' [Citations.]" (*Id*. at pp. 287-288, italics added.) " 'A criminal defendant is entitled to an instruction on a lesser included offense only if [citation] "there is evidence which, if accepted by the trier of fact, would absolve [the] defendant from guilt of the greater offense" [citation] *but not the lesser*. [Citations.]' [Citations.]" (*Id.* at p. 288.)

"A criminal defendant has a constitutional right to have the jury determine every material issue presented by the evidence, and an erroneous failure to instruct on a lesser included offense constitutes a denial of that right. To protect this right and the broader interest of safeguarding the jury's function of ascertaining the truth, a trial court must instruct on an uncharged offense that is less serious than, and included in, a charged

---

[10]     Of course, the jury found appellant not guilty of forcible lewd acts in count four.

greater offense, even in the absence of a request, whenever there is substantial evidence raising a question as to whether all of the elements of the charged greater offense are present. [Citations.] [¶] But this does not mean that the trial court must instruct sua sponte on the panoply of all possible lesser included offenses. Rather, . . . ' "such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[ ]" ' that the lesser offense, but not the greater, was committed." ' [Citation.]" (*People v. Huggins* (2006) 38 Cal.4th 175, 215.) "Speculation is insufficient to require the giving of an instruction on a lesser included offense. [Citations.] In addition, a lesser included instruction need not be given when there is no evidence that the offense is less than that charged. [Citation.]" (*People v. Mendoza* (2000) 24 Cal.4th 130, 174.)

We review the trial court's failure to instruct on purportedly lesser included offenses under an independent or de novo standard of review. (*People v. Licas* (2007) 41 Cal.4th 362, 366.)

*Counts Four through Nine*

As to counts four through nine, appellant argues that the jury should have been given the option of convicting him of non-forcible lewd acts instead of forcible lewd acts, because forcible lewd acts require evidence that he used physical force substantially different from or substantially greater than necessary to accomplish the lewd act itself, or requires evidence that he made a direct or implied threat of force, violence, danger, hardship or retribution. Appellant asserts there was a question as to whether any force or threat was used to commit the lewd acts—Jane told the police that appellant began touching her vagina when she was eight or nine years old, but she did not report that he used any force, nor did she report that he made a direct or implied threat of any kind

11

when touching her. Thus, he cont8ends that a reasonable jury could have concluded that the touching was non-forcible.

We disagree. There was simply no factual basis to provide the jury with an instruction on non-forcible lewd acts. Either the acts happened as Jane described, under the circumstances Jane described or they did not. As noted *ante*, Jane described how appellant would beat her if she did not listen; this started when she was about eight years old. Appellant would use a looped belt to hit her on her behind or sometimes her back or legs. As to the lewd touching, Jane told the police that appellant would touch her vagina on almost a daily basis until she was 13.

Given these circumstances, no reasonable jury could have concluded that if the acts happened they were non-forcible. The evidence established that appellant would beat Jane if she did not listen to him; from this no reasonable jury could conclude that Jane was not fearful that if she failed to go along with what appellant was doing to her it would result in severe punishment—the implied threat of violence was constantly present. Under these circumstances, as noted *ante*, appellant's actions constituted duress. (*People v. Senior* (1992) 3 Cal.App.4th 765, 775 [duress present where the defendant was the victim's father and an authority figure, and had physically controlled her by pulling her back when she tried to resist]; *People v. Schulz*, *supra*, 2 Cal.App.4th at p. 1005 [sufficient evidence of duress where the defendant was the victim's adult uncle and authority figure and used physical dominance to prevent her from resisting].)

Accordingly, we conclude that as to counts four through nine, the trial court was not required to instruct on non-forcible lewd touching as there was simply no evidence from which the jury could conclude that appellant was guilty of only the lesser offense of non-forcible lewd acts.

*Count One and Counts 10 through 13*

Appellant contends that as to the forcible rape charges in counts 10 through 13 and the aggravated sexual assault based on forcible rape charged in count one, the trial court

12

should have given the jury the option of convicting him of unlawful sexual intercourse with a minor under section 261, subdivision (a) because Jane's initial reports provided a basis for a reasonable jury to conclude that the lesser offense rather than the charged forcible rapes occurred.

Appellant asserts that under the accusatory pleadings test,[11] unlawful sexual intercourse with a minor under section 261.5, subdivision (a) is a lesser included offense of the charged forcible rapes charged in counts 10 through 13 and the aggravated sexual assault charged in count one. Respondent does not challenge this assertion. We will assume for the sake of argument that appellant is correct.

However, again we find no error. There was simply no factual basis to conclude that if the sexual intercourse occurred it was not accomplished by force or more particularly duress. Again, Jane described what would happen if she did not listen to appellant—he would beat her with a belt. As to the act of intercourse, each time it happened he would make her lie down; the intercourse happened approximately twice a week up until about two weeks before she ran away. She told Officer Ballard that sometimes appellant forced her and other times she went along with it for fear of getting hit; Jane told him that appellant had hit her in the past. Either the acts happened as Jane described in her initial testimony or they did not.[12] In other words, we see no plausible scenario in which a reasonable jury could have concluded that all the acts happened as

---

[11]     A lesser included offense is defined by one of two tests, the " 'elements' " test and the " 'accusatory pleading' " test. (*People v. Lopez, supra*, 19 Cal.4th at p. 288.) An offense is a lesser included offense under the " 'elements' " test "if the statutory elements of the greater offense include all the elements of the lesser offense so that the greater offense cannot be committed without committing the lesser offense." (*People v. Cook* (2001) 91 Cal.App.4th 910, 918.) An offense is a lesser included offense under the " 'accusatory pleading' " test if the facts alleged in the pleading "describe the offense in such a way that, if committed as alleged, the lesser offense necessarily must have been committed." (*People v. Cheaves* (2003) 113 Cal.App.4th 445, 454.)

[12]     Appellant's admission that he had consensual intercourse with Jane only once was simply just not credible.

13

Jane described, but the element of duress was not present.  There is just no good reason to discount Jane's description of the circumstances under which the forcible rapes occurred.

Given these circumstances, there was no factual basis for a reasonable jury to conclude that if the acts happened they were non-forcible.  Accordingly, the trial court was not required to instruct on unlawful sexual intercourse with a minor as a lesser included offense of the forcible rapes.

*Count Three*

Appellant contends that the court erred by not instructing on non-forcible oral copulation (§ 288a, subds. (b)(1) [oral copulation with a person under age 18], (b)(2) [oral copulation by a person over 21 with person under age 16], or (c)(1) [oral copulation by person over 21 with a person under age 14 and more than 10 years younger]) as lesser included offenses to aggravated sexual assault based on forcible oral copulation in count three.

Again, appellant asserts that under the accusatory pleading test each of those offenses were lesser included offenses of the aggravated sexual abuse charge based on forcible oral copulation in count three.  Again, respondent does not challenge this assertion and again, we will assume for the sake of argument that appellant is correct.

According to appellant, Jane did not specifically say the oral copulation was accomplished with force, fear, or duress on every occasion.  He argues that similar to the rape charge Jane's initial report failed to establish that appellant used force, fear or duress on every single occasion of oral copulation.

Again, for all the same reasons, we are not persuaded that there was a factual basis for instructing on non-forcible oral copulation.  On the record before us as outlined *ante*, we cannot say that there was evidence which, if accepted by the jury, would have absolved appellant of the greater offense of forcible oral copulation but not the lesser offense of non-forcible oral copulation.  (*People v. Memro* (1995) 11 Cal.4th 786, 871.)

14

As to all the sexual offenses, for the jury to have returned guilty verdicts on non-forcible sex crimes, the jury would have been required to accept all the same evidence on which it found appellant guilty of the forcible sex crimes, but have not believed that the crimes were accomplished by duress. No reasonable jury could have so concluded on this record. If the jury believed Jane's trial testimony no sexual offenses occurred; if they believed her initial report to the police, the sexual offenses occurred and they were accomplished by duress.

In sum, we reject appellant's argument that the trial court erred in failing to instruct on the non-forcible lesser included offenses to all the forcible sex crimes.

*III. Circumstantial Evidence Instruction*

Appellant contends that the trial court erred by failing to instruct on how to consider circumstantial evidence of facts other than his mental state. Appellant asserts that the disputed issue in this case concerned whether the alleged acts occurred, not whether he had the required intent or mental state. Appellant argues the trial court was required to instruct the jury with CALCRIM No. 224[13] and by failing so to do the court violated its duty to instruct on general principles of law relevant to the issue of the case, reduced the prosecutor's burden of proof and deprived him of his constitutional rights to

---

[13]     CALCRIM No. 224 provides: "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt. [¶] Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

15

due process and trial by jury. Furthermore, the giving of CALCRIM No. 225[14] did not render the error harmless and may have contributed to the prejudice.

*Background*

The court instructed the jury with CALCRIM No. 223 on the definitions of direct and circumstantial evidence and as appellant points out with CALCRIM No. 225. As given in this case, CALCRIM No. 223 explained to the jury that "[f]acts may be proven by direct or circumstantial evidence or by a combination of both. [¶] Direct evidence can prove a fact by itself. For example, it a witness testifies he saw it raining outside before he came into the courthouse, that testimony is direct evidence that it was raining. [¶] Circumstantial evidence also may be called indirect evidence. Circumstantial evidence does not directly prove the fact to be decided but is evidence of another fact or group of facts from which you may logically and reasonably conclude the truth of the fact in question. For instance, if a witness testifies that he saw someone coming inside wearing a raincoat covered with drops of water, that testimony is circumstantial evidence; because it may support a conclusion that it was raining outside. [¶] Both direct and circumstantial evidence are acceptable types of evidence that prove or disprove the

---

[14] As given in this case, CALCRIM No. 225 provided, "The People must prove not only that the defendant did the acts charged, but also that he acted with a particular intent. The instruction for each crime and allegation explains the intent required. [¶] An intent may be proved by circumstantial evidence. Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt. [¶] Also, before you may rely on circumstantial evidence to conclude that the defendant had the required intent, you must be convinced that the only reasonable interpretation supported by the circumstantial evidence is that the defendant had the required intent. [¶] If you can draw two or more reasonable conclusions from the circumstantial evidence and one of those reasonable conclusions supports a finding that the defendant did have the required intent or mental state and another reasonable conclusion supports a finding that the defendant did not, you must conclude that the required intent was not proved by the circumstantial evidence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

16

elements of a charge including intent and mental state and acts necessary to a conviction, and neither is necessarily more reliable than the other. Neither is entitled to greater weight than the other. You must decide whether a fact in issue has been proved based on all the evidence."

We consider a claim of instructional error under the de novo standard of review. Nevertheless, " ' "[i]n determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.". . .' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

CALCRIM Nos. 224 and 225 both instruct the jury on the proper use of circumstantial evidence. CALCRIM No. 224 and CALCRIM No. 225 are each accurate statements of the law. (*People v. Ibarra* (2007) 156 Cal.App.4th 1174, 1186–1187 [upholding CALCRIM No. 224]; *People v. Golde* (2008) 163 Cal.App.4th 101, 118 [upholding CALCRIM No. 225].) CALCRIM No. 225 is to be used in place of CALCRIM No. 224, " 'when the defendant's specific intent or mental state is the only element of the offense that rests substantially or entirely on circumstantial evidence.' [Citations.]" (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1171–1172 (*Samaniego*).) Both instructions "provide essentially the same information on how the jury should consider circumstantial evidence, but CALCRIM No. 224 is more inclusive." (*Id.* at p. 1172.)

The more general circumstantial instruction (CALCRIM No. 224 or its predecessor CALJIC No. 2.01)[15] is proper where issues such as identity rest primarily on

---

[15] "CALCRIM No. 224 corresponds to former CALJIC No. 2.01 and CALCRIM No. 225 corresponds to former CALJIC No. 2.02. Case law addressing CALJIC instructions is still generally applicable to the corresponding CALCRIM instruction. [Citation.]" (*People v. Contreras* (2010) 184 Cal.App.4th 587, 591, fn. 4.)

circumstantial evidence. (*People v. Rogers* (2006) 39 Cal.4th 826, 885 (*Rogers*).)[16]

However, it is error to give the more specific instruction on circumstantial evidence of intent or mental state (CALCRIM No. 225 or its predecessor CALJIC No. 2.02) where the defendant's intent is not the only element of the prosecution's case resting on circumstantial evidence. (*Rogers, supra,* 39 Cal.4th at p. 885; *People v. Cole* (2004) 33 Cal.4th 1158, 1222.)

The more general circumstantial instruction, CALCRIM No. 224 is only required where the prosecution's case *substantially* relies on circumstantial evidence. " '[W]here circumstantial inference is not the primary means by which the prosecution seeks to establish that the defendant engaged in criminal conduct, the instruction may confuse and mislead, and thus should not be given.' [Citation.]" (*People v. Brown* (2003) 31 Cal.4th 518, 562.) Thus, in *People v. Yeoman* (2003) 31 Cal.4th 93, where the defendant made incriminating extrajudicial admissions, the court held that "the trial court reasonably determined for purposes of instructing the jury that the People's case did not rest substantially or exclusively on circumstantial evidence." (*Id.* at p. 143.)

In *People v. McKinnon* (2011) 52 Cal.4th 610 (*McKinnon*), our Supreme Court reaffirmed that the trial court is required to instruct the jury with the more general circumstantial evidence instruction "when the prosecution relies substantially on circumstantial evidence to prove guilt. [Citations.] Conversely, the instruction need not be given when circumstantial evidence is merely incidental to and corroborative of direct

---

[16] In *Rogers*, *supra*, 39 Cal.4th 826, there was no direct evidence linking the defendant to a murder, and so the prosecutor relied on circumstantial evidence to prove identity. (*Id.* at p. 885.) The trial court instructed on the use of circumstantial evidence to prove only mental state and failed to instruct more generally on the use of such evidence to prove other elements. (*Ibid.*) The Supreme Court held that it was error not to give the more generally applicable instruction. However, the court found the error harmless because the evidence of identity was "strong," and the evidence pointing to innocence was "weak." (*Id.* at p. 886.) Under the circumstances, the court found no reasonable probability the jury would have found that the defendant did not kill the victim had the general instruction been given. (*Ibid*.)

evidence, due to the 'danger of misleading and confusing the jury where the inculpatory evidence consists wholly or largely of direct evidence of the crime.' [Citations.]" (*Id*. at p. 676.)[17]

We reject appellant's argument that circumstantial evidence comprised a significant part of the prosecution's case. As respondent points out, the prosecution did not rely exclusively, substantially, or even significantly on circumstantial evidence to prove its case against appellant. Here, the prosecution relied upon direct evidence to establish guilt—Jane's initial accusations given to police officers that appellant sexually molested her over a nine-year period. Testimony from the victim is direct evidence. (*People v. Baldwin* (1979) 97 Cal.App.3d 396, 401 [eyewitness testimony is direct evidence].) Although the jury had to determine whether or not this initial accusation was credible, it did not have to determine what reasonable inferences could be drawn from Jane's testimony. Either she was credible or she was not. A jury's credibility determination has to do with the weight of the evidence, or value of the evidence, not its nature. (*McKinnon*, *supra*, 52 Cal.4th at p. 676, fn. 40.)

Even if we were to accept that appellant's extra-judicial admission that he had a sexual encounter with Jane was circumstantial evidence that the crimes were committed, corroborative circumstantial evidence does not require the more general circumstantial evidence instruction. (*McKinnon*, *supra*, at p. 676.)

In sum, we reject appellant's argument that the trial court erred in failing to give CALCRIM No. 224.

---

[17] The *McKinnon* court was concerned with CALJIC No. 2.01. However, as noted *ante*, "[c]ase law addressing CALJIC instructions is still generally applicable to the corresponding CALCRIM instruction. [Citation.]" (*People v. Contreras*, *supra*, 184 Cal.App.4th at p. 592, fn. 4.)

*IV. Admission of CSAAS Evidence*

Appellant argues that it was error for the trial court to admit expert testimony on CSAAS because there was no evidence that the jurors needed to be disabused of any misconceptions; and instructing the jury that it could use the expert testimony to consider the believability of the victim's testimony "served to improperly bolster the credibility of [Jane's] initial allegations."

Before trial, appellant requested that the trial court preclude the prosecution from admitting any testimony about CSAAS. Defense counsel argued that the proposed testimony did not pass the *Kelly-Frye* test,[18] that it would be irrelevant and unduly prejudicial.

During the hearing on in limine motions, the trial court asked the prosecutor why he was offering the CSAAS testimony of Carl Lewis. The prosecutor explained that Jane had recanted her allegations at the preliminary hearing a few months after her initial report. Accordingly, the prosecutor asserted that the CSAAS testimony was "necessary to explain that this type of recantation is something that does happen with victims because of fear, because of familial issues, because of the pressures related to being a part of the criminal justice system."

Defense counsel argued that the prosecutor had not made a proper foundation for admission of the CSAAS testimony. Defense counsel noted that under case law CSAAS testimony was admissible only to rebut misconceptions, not to engender sympathy for the victim. Defense counsel pointed out that the prosecutor had not identified a specific popular misconception related to CSAAS.

The prosecutor asserted that it was a popular misconception that a victim would not recant allegations, to which the court asked whether the prosecutor was seeking to

---

[18]     *People v. Kelly* (1976) 17 Cal.3d 24, *Frye v. United States* (D.C. Cir. 1923) 293 Fed. 1013.

admit CSAAS testimony on the issue of delayed disclosure. The prosecutor clarified that he wanted CSAAS testimony without limitation.

Defense counsel next argued that the CSAAS testimony was only relevant if it assisted the trier of fact and proposed that the prospective jurors be questioned on any popular myths about child sexual abuse they might have. The trial court agreed that the parties could voir dire on this subject, but indicated that the court might still admit the evidence even if all the jurors said that they did not subscribe to the myths that CSAAS was designed to rebut.

During voir dire, the court questioned some jurors individually on some CSAAS concepts. Defense counsel followed up by questioning the 18 prospective jurors about CSAAS concepts as a group. Specifically, counsel asked the group whether they believed that a teenager was lying because he or she waited years to make a claim of abuse. In addition, he asked whether they would think that no abuse happened if a teenager reported sexual abuse but then retracted the allegation. According to defense counsel, to each question the prospective jurors unanimously answered, "No."

Later defense counsel asked the prospective jurors as a group whether any of them thought they knew "how a kid would look if they had in fact been sexual[ly] abused." Again, all the jurors responded "No."[19]

During the trial, again, defense counsel objected to Lewis's proposed CSAAS testimony. Counsel argued that in light of the jury voir dire, the expert testimony was not necessary to help the jury. The court noted that the jurors had agreed that delayed disclosure and retraction did not mean a report of sexual abuse was false. The prosecutor argued that the jurors had merely noted that they were "open to that possibility," but that they might still have misconceptions.

_____

[19]    The alternate jurors were questioned in a similar fashion and agreed that neither delayed disclosure nor retraction would automatically mean that the child was lying or that the child had not been abused.

Defense counsel reminded the court that not one juror said that delayed disclosure or retraction meant that there had been no sexual abuse. The trial court took the matter under submission; the court commented "not each and every juror was voir dired on the question" but "there was consensus" among the jurors.

Subsequently, the court discussed the issue with counsel. The court noted that "over time what may be generally accepted as myths become no longer myths; and when we reach that point, if we've reached that point, then in the narrow scope of a particular factual situation or case this testimony may not be relevant and necessary. On this case I will accept the responsibility and the blame. I'm not prepared to say that all 13 jurors have accepted and expressed that . . . they no longer subscribe to these myths. All the jurors we asked basically said that, but I don't think we asked all 13, and I don't think we have that commitment on the record. And therefore . . . I am satisfied that the testimony of the experts in this area will be appropriate under [Evidence Code section] 801 for one or more of the jurors." Accordingly, the CSAAS experts were allowed to testify as noted *ante*.

Later, the court instructed the jurors pursuant to CALCRIM No. 1193, on how to consider the CSAAS testimony of both the prosecution's expert and the defense expert. Specifically, the court told the jury, "You have heard testimony from Carl Lewis and Dr. Annette Ermshar regarding Child Sexual Abuse Accommodation Syndrome. Mr. Lewis and Dr. Ermshar's testimony about Child Sexual Abuse Accommodation Syndrome is not evidence that the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not [Jane] Doe's conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of her testimony."

Expert testimony concerning CSAAS is used to describe and explain how children commonly react to sexual molestation. (*People v. Bowker* (1988) 203 Cal.App.3d 385, 394 (*Bowker*); see also *People v. Patino* (1994) 26 Cal.App.4th 1737, 1742–1743, 1744

22

(*Patino*).) Common stress reactions of children who have been sexually molested "may include the child's failure to report, or delay in reporting, the abuse." (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300 (*McAlpin*).) A sexually molested child may also react by recanting his or her story in whole or in part. (*Bowker, supra,* 203 Cal.App.3d at p. 394.)

"[E]xpert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." (*McAlpin, supra,* 53 Cal.3d at p. 1300; see also *Patino, supra,* 26 Cal.App.4th at p. 1744 [although inadmissible to prove that a molestation occurred, CSAAS testimony has been held admissible for the limited purpose of disabusing a jury of misconceptions it might hold about how a child reacts to a molestation].)

Thus, expert CSAAS testimony "is admissible *solely* for the purpose of showing that the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested." (*Bowker, supra,* 203 Cal.App.3d at p. 394.)

Previous appellate decisions have held that evidence of all the factors that comprise CSAAS is relevant in cases involving the sexual abuse of minors (see, e.g., *McAlpin*, *supra*, 53 Cal.3d at pp. 1300–1302; *People v. Housley* (1992) 6 Cal.App.4th 947, 958–959 (*Housely*)), however, "the jury must be instructed simply and directly that the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true." (*Bowker, supra,* at p. 394.)[20] On review, we presume

---

[20] One court has held, "[B]ecause of the potential for misuse of CSAAS evidence, and the potential for great prejudice to the defendant in the event such evidence is misused, it is appropriate to impose upon the courts a duty to render a sua sponte instruction limiting the use of such evidence. Accordingly, in all cases in which an expert is called to testify regarding CSAAS we hold the jury must sua sponte be instructed that (1) such evidence is admissible solely for the purpose of showing the victim's reactions as demonstrated by the evidence are not inconsistent with having been

that the jury understood and followed that instruction. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 83.)

The premise of the first part of appellant's argument is that because all the jurors when questioned as a group answered "no" to defense counsel's questions regarding delayed disclosure and recantation this particular jury was not constrained by any popular myths about how a child would react to sexual abuse. This is entirely speculative. The cursory response of the group does not allow us to conclude that individually each and every juror had a complete understanding of the myths associated with CSAAS. Nor did it foreclose the possibility that the expert testimony would be beneficial to the jury's understanding on the subject.

Furthermore, appellant's position is contrary to the controlling authority in this state. (See *People v. Brown* (2004) 33 Cal.4th 892, 906–907 [reaffirming earlier reasoning for admitting CSAAS evidence].) To the extent that our Supreme Court has recognized that such evidence may be relevant, useful, and admissible in a given case, as an intermediate appellate court, we are in no position to rule otherwise. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

In any event, the expert's testimony concerning CSAAS was helpful in explaining the different reactions that some victims have to sexual abuse. (See *Patino, supra,* 26 Cal.App.4th at p. 1744 [CSAAS evidence admissible to disabuse misconceptions about how a child reacts to molestation].) Jurors may have an understanding that victims of abuse are reluctant to report the offense and may later recant their report, but they may

molested; and (2) the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true." (*Housley*, *supra*, 6 Cal.App.4th at pp. 958–959; but see *People v. Stark* (1989) 213 Cal.App.3d 107, 116 [the instruction must be requested of the trial court].) The purpose of the limiting instruction is to avoid misuse of CSAAS testimony and the expert inadvertently corroborating the victim's claim "because the expert commonly is asked to offer an opinion on whether the victim's behavior was typical of abuse victims, an issue closely related to the ultimate question of whether abuse actually occurred." (*Housley, supra,* at p. 958.)

24

not understand the reasons for the delayed reporting, or why the victims recant.

Accordingly, the trial court could have reasonably found that the expert testimony would add to the jurors' common fund of information regarding the reactions of abuse victims. As such, we cannot say that the trial court erred in allowing testimony on CSAAS on the issue of delayed reporting and recantation. (*People v. McDowell* (2012) 54 Cal.4th 395, 426 [the trial court has broad discretion in deciding whether to admit or exclude expert testimony].)

The second part of appellant's argument concerns what he characterizes as a "flawed" instruction. In essence, appellant's argument is that the challenged portion of CALCRIM No. 1193 invited the jury to find the complaining witnesses more believable based on the CSAAS testimony. Appellant argues that using "CSAAS evidence to evaluate the believability of the victim is the same as using the evidence 'to determine whether the victim's molestation claim is true,' which is specifically prohibited."

Respondent claims that appellant has forfeited the challenge to CALCRIM No. 1193. We are not persuaded. Appellant did not object to this instruction and in fact agreed that it should be given. Nonetheless, we reject the Attorney General's argument that appellant forfeited this claim by failing to object to the court's instruction below. Appellant claims the instruction does not correctly state the law and affects his substantial rights. Thus, even in the absence of an objection we may consider the merits of a challenge to a jury instruction, if the instruction affected the appellant's substantial rights. (§ 1259; *People v. Hudson* (2006) 38 Cal.4th 1002, 1011–1012 [no forfeiture when trial court gives an instruction that is an incorrect statement of the law].) Thus, we will address his claim on appeal.

When reviewing a purportedly erroneous instruction, we ask whether there is a reasonable likelihood that the jury understood the instruction in the improper manner appellant suggests. In making this inquiry, we consider the language in question in the context of the overall charge. (*People v. Richardson* (2008) 43 Cal.4th 959, 1028.)

25

There is no reasonable likelihood that the jury understood the instruction as appellant asserts. The language permitting jurors to use CSAAS testimony to evaluate the believability of the complaining witnesses refers simply to the fact that evaluation of the credibility of the alleged victims may require consideration of common reactions of such victims. This is proper. Further, the court admonished the jury that CSAAS testimony is not evidence that appellant committed any of the charged crimes. In addition, the court delivered accurate instructions relating to reasonable doubt and the presumption of innocence.

The final sentence of CALCRIM No. 1193, to which appellant objects, merely informs the jury that it *may* consider the CSAAS evidence for purposes of deciding only (1) whether the conduct of a putative molestation victim is consistent with the conduct of someone who has actually been molested, and (2) whether the testimony of a putative molestation victim is credible. The instruction does not require the jury to consider the CSAAS evidence at all. It merely informs the jury of the very narrow issues to which the CSAAS evidence may be considered relevant. (See *People v. Brown, supra,* 33 Cal.4th at p. 906.)

We reject the premise of appellant's argument. The instruction did not tell the jury to believe Jane if her conduct was consistent with the CSAAS testimony. Jane's credibility was very much in dispute and an important question for the jury to determine. Simply put, we disagree with appellant's view that the instruction effectively, albeit implicitly, told jurors the CSAAS evidence could be used to determine whether Jane's claim was true. Instructing a jury that they *may* consider CSAAS testimony in evaluating a complaining witness's credibility is simply not the same as telling them they can use the CSAAS testimony to determine whether the claim is true. Appellant's interpretation reads into the instruction something that is not there.

Accordingly, we reject appellant's argument that the jury was improperly instructed on how to use the expert testimony on CSAAS.

26

*V. Cumulative Error*

Appellant argues that considered cumulatively, the trial court's instructional and evidentiary errors violated his right to a fair trial.

Certainly, " '[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.' [Citation.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.) The combined effects of multiple *errors* may indeed render a trial fundamentally unfair. (See *People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.) However, as discussed *ante*, since we have found none of appellant's claims of error meritorious, a cumulative error argument cannot be sustained. No serious errors occurred, which whether viewed individually or in combination, could possibly have affected the jury's verdict. (*People v. Martinez* (2003) 31 Cal.4th 673, 704; *People v. Valdez* (2004) 32 Cal.4th 73, 128.) To put it another way, since we have found no substantial error in any respect, appellant's claim of cumulative prejudicial error must be rejected. (*People v. Butler* (2009) 46 Cal.4th 847, 885.) Appellant was entitled to a fair trial, not a perfect one. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1057.)

*VI. Alleged Failure to Hold a Marsden Hearing*

Appellant contends that the court violated his Sixth Amendment right to counsel when it failed to conduct a *Marsden* hearing on the day of his sentencing hearing. Specifically, appellant asserts that he requested a new attorney on the day of sentencing; and because the trial court failed to conduct a *Marsden* hearing his right to counsel was violated and requires reversal of the judgment.

*Background*

Initially, appellant made a *Marsden* motion on March 1, 2011, before the trial began. Appellant complained that his deputy public defender was pressuring him to take an offer of 30-40 years in state prison when he was not guilty of the charges. In addition, he complained that trial counsel's investigation had found nothing helpful to his defense.

27

In response, defense counsel asserted that no defense evidence could surmount appellant's admission to having had intercourse with Jane once. The trial court asked counsel if he had considered asking for suppression of appellant's statement and counsel responded that he had. Appellant stated that he had lied to the police and made the admission out of fear of the other charges. Ultimately, the trial court denied the motion.

On the day of the sentencing hearing, appellant complained to the court that trial counsel did not help him at all during the trial; counsel never made any motions on his behalf, refused to withdraw from the case and could not obtain an acquittal when the prosecution had no proof. The trial court told appellant that none of his complaints were valid; not one of the motions that appellant mentioned would have been granted, counsel was an extremely experienced attorney who aggressively defended him and presented the case with the highest level of professionalism, and the evidence against him was legally sufficient. Specifically, the court told appellant, "I don't know what more you expected [trial counsel] to do. He aggressively protected your interests within the framework of what you gave him. He aggressively presented your case. The jury rejected it."

The rule from *Marsden* is well settled: " ' " 'When a defendant seeks to discharge his appointed counsel and substitute another [appointed] attorney, and asserts inadequate representation, the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance. [Citation.] A defendant is entitled to relief if the record clearly shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result.' " [Citation.] The decision whether to grant a requested substitution is within the discretion of the trial court; appellate courts will not find an abuse of that discretion unless the failure to remove appointed counsel and appoint replacement counsel would "substantially impair" the defendant's right to effective assistance of counsel.' " (*People v. Abilez* (2007) 41 Cal.4th 472, 487–488.)

28

It is equally well settled that to invoke a defendant's right under *Marsden* to substitute one appointed counsel for another, "[a]lthough no formal motion is necessary, there must be 'at least some clear indication by defendant that he wants a substitute attorney.' [Citation.]" (*People v. Mendoza* (2000) 24 Cal.4th 130, 157.) Grumblings about counsel's performance is insufficient. (*People v. Lucky* (1988) 45 Cal.3d 259, 281; *People v. Lee* (2002) 95 Cal.App.4th 772, 780.)

At the sentencing hearing, defense counsel told the court that appellant wanted to address the court. The following colloquy occurred:

"[Appellant]: . . . Before you find me guilty, before I am sentenced, I would like to please ask your permission to say a few things.

The Court: Go ahead, sir.

[Appellant]: I don't understand English nor can I read it, but someone explained my rights to me before the trial. I had the opportunity to speak with the judge and with the public defender in court. I let him know that my attorney is not doing anything towards my defense. For example, my attorney could have brought motions on my behalf, --

The Court: What kind of motions, sir?

[Appellant] -- and he didn't bring - -

The Court: What kind of motions?

[Appellant] -- any motions. Never.

The Court: Motions for what?"

Appellant stated that counsel could have brought a motion to "have the charges dismissed" and a "1538.5 motion" and "1385" and "995" and "1118.1 A." The court told appellant that none of these motions would have had any legal validity. When appellant asked why, the court told him "[t]hat was what your attorney was to evaluate. There was no legal basis, as I understand it, for those motions to be brought." Appellant reiterated that counsel "didn't do it." Then he asked the court to look at some papers he had. The

court asked defense counsel to explain what appellant was asking for. Counsel responded that he was not sure, but would look at appellant's documents. After so doing, counsel told the court they appeared "to be photo copies of the California Criminal Defense Practice book." Appellant confirmed that that was correct, and the court said it did not need to see the document, but allowed appellant to continue as follows.

"[Appellant]: Before you pronounce that I'm guilty - - well, I already mentioned the bit about the motions. What I wanted to say is the judge never let me change attorneys . . . and my attorney said that he was not going to withdraw from the case, that he would stay with me until the trial. And I had the right to get a different attorney, and I was denied that right. I had a right to get a different attorney because this one was not helping me. In the space of one year he only went to see me twice out in Milpitas. That's not enough time to prepare a defense for me. Why was I denied this right? I had the right to have a different attorney. I think he had something personal with me, because we were always arguing. I told him several times, but he said, no, he had to stay with my case. He stood firm with that until the end of the trial. We were always arguing. We were always fighting. And I was never able to talk with him or ask him questions. How was he going to defend me if he had only seen me twice during the year that I was incarcerated?"

The court asked appellant if he had anything else to say, to which appellant replied, "Why was I found guilty? The D.A. did not have evidence. I never saw -- I never saw that they showed evidence for the crimes I was accused of. My attorney knows that very well. How was I found guilty if they didn't have proof? That's what I want to know. Why was I found guilty? She's here. She's present. They can -- they can ask her. They already asked her several times at the prelim and at the trial. She says she told the truth. What good is it for her to come here to swear to tell the truth and then they don't believe her? Why did they swear to tell the truth if they're not believed? I want to

30

know why I was found guilty if the D.A. did not have proof. He didn't show proof that would generate the sentence that they want to give me."

After the court asked appellant if he wanted to say anything further, appellant replied that his wife wanted to address the court. After Jane's mother addressed the court, defense counsel stated that he understood his client's frustration given the amount of prison time he was facing. Counsel stated that after the trial his client had thanked him for his trial work. Appellant asserted that counsel was lying. The court asked defense counsel to continue. Defense counsel stated that he did not blame appellant for "feeling sour about the process" because he was facing an "enormous amount of time." Counsel hoped that the court would understand how much of what appellant was saying was caused by "fear." Appellant asked if he could say something. The court told him, to "[h]old on," and allowed defense counsel to continue. Counsel thanked the court for its "time and trouble" and "patience and time." The court then turned to appellant's request and said, "If all you're going to do is attack your lawyer, no, sir. Do you have something additional you want to say?"

Appellant stated that he was "not afraid, because [he] never committed a crime like my attorney is saying. I -- I struggled against my attorney and I struggled against the D.A. in this case. This attorney did not help me at all and I told it to him to his face. He never help [*sic*] me at all." The court told appellant that he was repeating himself. Appellant replied that he had "wanted to get a different attorney" and he "was denied that right to get a different attorney." At no time did appellant explicitly request a new attorney for the sentencing hearing.

As can be seen, appellant said that he wanted a new attorney for trial, but never expressly or by implication said that he wanted a new attorney for the sentencing hearing. However, relying on *People v. Lara* (2001) 86 Cal.App.4th 139, 158, appellant argues that the trial court's duty to conduct a *Marsden* inquiry arises once a defendant asserts

31

directly or by implication that his counsel's performance has been so inadequate as to deny him his constitutional right to effective counsel.

As we shall explain, we are not persuaded that the court was required to conduct a *Marsden* inquiry under the facts of this case. In essence, appellant's complaint about his attorney was that he had not received effective assistance throughout his trial.

The need for a hearing under *Marsden* arises "[w]hen a defendant seeks to discharge his appointed counsel and substitute another attorney, and asserts inadequate representation." (*People v. Richardson* (2009) 171 Cal.App.4th 479, 484.) A request for substitution of appointed counsel can be made both before and after trial. "[T]he standard expressed in *Marsden* and its progeny applies equally preconviction and postconviction." (*People v. Smith* (1993) 6 Cal.4th 684, 694.)

However, in *People v. Sanchez* (2011) 53 Cal.4th 80 (*Sanchez*), the Supreme Court addressed the common practice of appointing "conflict" counsel when a *Marsden* request is made. In the course of its decision, the court reiterated that a *Marsden* hearing is required only when "there is 'at least some clear indication by defendant,' either personally or through his current counsel, that defendant 'wants a substitute attorney.' " (*Id.* at pp. 89–90.)[21] In a footnote, the court expressly disapproved a series of cases decided by the appellate court to the extent they "incorrectly implied that a *Marsden* motion can be triggered with something less than a clear indication by a defendant" or his counsel that the defendant " 'wants a substitute attorney.' " (*Id.* at p. 90, fn. 3.) In these disapproved cases, the court had implicitly, if not explicitly, held that a defendant's expressed desire to make a new trial motion or motion to withdraw a plea on the basis of

---

[21] Specifically, the *Sanchez* court stated, "[A] trial court is obligated to conduct a *Marsden* hearing on whether to discharge counsel for all purposes and appoint new counsel when a criminal defendant indicates after conviction a desire to withdraw his plea on the ground that his current counsel provided ineffective assistance," but "only when there is 'at least some clear indication by defendant,' either personally or through his current counsel, that defendant 'wants a substitute attorney.' [Citation.]" (*Sanchez,* at pp. 89–90.)

claimed ineffective assistance of counsel, without more, should be treated as triggering *Marsden* hearing requirements. (E.g., *People v. Mejía* (2008) 159 Cal.App.4th 1081, 1086 [although defendant made no request for substitute or even conflict counsel, court nevertheless concluded he made a *Marsden* motion because he instructed his counsel to move for a new trial largely on the basis of his counsel's performance at trial and that his counsel so informed the trial court].)

No duty under *Marsden* to inquire into appellant's claim of ineffective assistance of counsel arose here because appellant never gave a "clear indication" that he wanted to replace his appointed counsel at the sentencing hearing. On the contrary, there was no suggestion appellant wanted a new attorney at that time. His complaints were addressed to what had happened during the trial and his desire at the first *Marsden* hearing to have new counsel appointed. In essence, the relief appellant sought in connection with his claim of ineffective assistance was a new trial or an acquittal. Appellant may have refrained from seeking new counsel because, the motion having been made at a sentencing hearing, counsel's representation was nearly at an end. Whatever the reason may be, however, appellant's failure to request substitute counsel, or even to suggest he desired a new attorney for the sentencing hearing, rendered *Marsden* inapposite.

Finally, even if we assumed for the sake of argument that the court erred in not conducting a *Marsden* inquiry, *Marsden* does not establish a rule of per se reversible error. (*People v. Chavez* (1980) 26 Cal.3d 334, 348–349.) Appellant must show "either that his *Marsden* motion would have been granted had it been heard, or that a more favorable result would have been achieved had the motion in fact been granted." (*People v. Washington* (1994) 27 Cal.App.4th 940, 944.) The failure to rule on the motion did not affect appellant's trial in any way. The motion was made only *after* he had been convicted. The basis for such a motion at such a time could have been only that his attorney had acted incompetently at trial. Appellant made no suggestion that his attorney would not represent him competently during the sentencing hearing. The fact that no

*Marsden* motion was entertained does not preclude appellant from attacking the competency of his attorney. Indeed, we have reviewed counsel's actions under the standards stated in *People v. Babbitt* (1988) 45 Cal.3d 660, 707 (*Babbitt*),[22] and conclude that no grounds for claiming ineffective assistance of counsel exist. Appellant was ably and aggressively represented by his appointed counsel and the evidence against him was nothing less than overwhelming. The fact that appellant admitted that he had a sexual relationship with Jane completely undermined Jane's recantation. We cannot see how the appointment of a different attorney at the sentencing hearing would have gained appellant a new trial, or could have had any effect on the sentence imposed.

*VII. Alleged Sentencing Error*

Appellant contends that the trial court erred by imposing consecutive indeterminate sentences on counts one and three (aggravated sexual assault based on rape and oral copulation respectively). Appellant argues that the evidence failed to establish that the underlying rape and oral copulation occurred on separate occasions. Moreover, he argues that although the trial court stated it would exercise its discretion to impose consecutive sentences, the court's stated reasons for so doing were erroneous.[23]

The statute under which appellant was convicted in counts one and three -- section 269 states, in pertinent part, "(c) The court shall impose a consecutive sentence for each

---

[22] In *Babbitt*, the court noted that "[t]he burden of proving ineffective assistance of counsel is on the defendant. [Citation.] To establish constitutionally inadequate representation, the defendant must show that (1) counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's deficient representation subjected the defense to prejudice, i.e., there is a reasonable probability that but for counsel's failings the result would have been more favorable." (*Babbitt*, *supra*, 45 Cal.3d at p. 707.)

[23] At sentencing, the court stated that it was imposing mandatory full-term consecutive sentences pursuant to section 667.6, subdivision (d). However, the court said that even if it had discretion under section 667.6 subdivision (c), the court would still impose consecutive sentences because "each count alleges separate events at separate days."

34

offense that results in a conviction under this section if the crimes involve . . . the same victim on separate occasions, as defined in subdivision (d) of Section 667.6."

In turn, section 667.6 subdivision (d) provides, "In determining whether crimes against a single victim were committed on separate occasions under this subdivision, the court shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon his or her actions and nevertheless resumed sexually assaultive behavior. Neither the duration of time between crimes, nor whether or not the defendant lost or abandoned his or her opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions."

Appellant argues that Jane testified that each time appellant engaged in sexual intercourse with her, first he would lick and rub her vagina. Appellant asserts that since count one charged rape and count three charged oral copulation as the underlying crimes the jury could have based its verdicts on acts that occurred on the same occasion. Relying on this court's opinion in *People v. Coelho* (2001) 89 Cal.App.4th 861 (*Coelho*), appellant contends that because it cannot be determined beyond a reasonable doubt that the jury's verdicts on these counts were based on acts that occurred on separate occasions, full term consecutive sentences were not mandatory. [24]

---

[24] In *Coelho, supra,* 89 Cal.App.4th 861, the defendant was convicted of multiple sex crimes as to which the trial court could have imposed concurrent sentences, discretionary consecutive sentences (§ 667.6, subd. (c)), or mandatory consecutive sentences (§ 667.6, subd. (d)), depending upon which of the multiple acts the convictions were based. Faced with an ambiguous verdict, this court considered the effect of *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490, which held that other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt. We recognized that "a defendant's federal constitutional right to a jury trial requires the trial court to accept the *jury's* determination concerning the factual bases for its verdicts." (*Coelho, supra,* at p. 878.) We concluded that where it cannot be determined beyond a reasonable doubt upon which unlawful acts among many the jury based its verdicts, the trial court should assume, for the purpose of sentencing, the factual bases that would

35

We are not convinced that *Coelho* is applicable to this case because even if the jury had found that the forcible oral copulation and the forcible rape occurred just as Jane described to the police—i.e. in one event, it would not have precluded the trial court from making the finding that the crimes involved the same victim on separate occasions. As

provide the most discretion. (*Id.* at p. 885.) This court concluded that the provision of the Three Strikes law that *requires* a trial court to impose a *consecutive* Three Strikes sentence for each current offense of which a defendant is convicted that is "not committed on the same occasion, and not arising from the same set of operative facts" as another current offense (see §§ 667, subd. (c)(6), (7), 1170.12, subd. (a)(6), (7)) should be interpreted to require a trial court to impose consecutive sentences only where the jury expressly found (or, in light of the record, must have found) beyond a reasonable doubt that its separate convictions were based on offenses that were not committed on the same occasion and did not arise from the same set of operative facts. (*Coelho, supra,* 89 Cal.App.4th at pp. 874–884.) In the absence of such an explicit or implied jury finding, we held, a trial court is not *required* to impose consecutive Three Strike sentences, and must exercise its ordinary discretion in determining whether to impose consecutive or concurrent sentences. (*Id.* at pp. 884–886.)

*Coelho* was based on our recognition that "a defendant's federal constitutional right to a jury trial requires the trial court to accept the *jury's* determination concerning the factual bases for its verdicts." (*Coelho, supra,* at p. 878.) We concluded that where it cannot be determined beyond a reasonable doubt upon which unlawful acts among many the jury based its verdicts, the trial court should assume, for the purpose of sentencing, the factual bases that would provide the most discretion. (*Id.* at p. 885.)

Nevertheless, our decision in *Coelho* preceded the United States Supreme Court decision in *Oregon v. Ice* (2009) 555 U.S. 160 (*Ice*), where the high court held that *Apprendi* does not apply to factual findings that bear on the question whether multiple sentences are to be imposed consecutively or concurrently. (*Id.* at pp. 163-164.) In *Ice,* the trial judge made findings that two of the six crimes of which the defendant was convicted constituted separate incidents within the meaning of state sentencing law. As a result, the trial judge exercised his discretion to impose consecutive sentences for the two crimes. (*Id.* at pp. 164–166.) The defendant argued that, under the rationale of *Apprendi,* and its progeny, the finding of fact necessary to impose a consecutive sentence must be made by the jury. The Supreme Court disagreed and held that the Sixth Amendment does not prohibit delegating to trial judges, rather than juries, the finding of facts necessary to support the imposition of consecutive, rather than concurrent, sentences. (*Id.* at pp. 166–169.) However, because the issue is not squarely presented here, we express no view on the validity of our holding in *Coelho* in light of the high court's subsequent decision in *Ice.*

36

we shall explain, where forcible sex crimes are concerned, the term "separate occasions" is something of a term of art.[25]

As section 667, subdivision (d) tells us, "the duration of time between the acts and the retention of the *opportunity to attack* again are not themselves determinative. [Citation.]" (*People v. Plaza* (1995) 41 Cal.App.4th 377, 385.)

Furthermore, "[a] finding that the defendant committed the sex crimes on separate occasions 'does not require a change in location or an obvious break in the perpetrator's behavior." [Citation.]" (*People v. King* (2010) 183 Cal.App.4th 1281, 1325 (*King*).)

As one court has explained with respect for forcible sex crimes, "[a] violent sexual assault cannot and should not be considered in the same light as sexual acts shared between willing participants. Consensual sex may include times when the participants go back and forth between varied sex acts, which they consider to be one sexual encounter. By contrast, a forcible violent sexual assault made up of varied types of sex acts committed over time against a victim, is not necessarily one sexual encounter. Such a sexual assault consisting of multiple types of sex acts committed against the victim is not motivated by sexual pleasure. Instead, it is frequently intended to degrade the victim. Sexual acts, such as those committed by defendant, are the antithesis of a consensual sexual encounter and should not be viewed the same way. Therefore, at sentencing a trial

---

[25] "The express legislative purpose for including the explication of the phrase 'separate occasions' was 'to abrogate the decision in [*People v. Craft* (1986) 41 Cal.3d 554 . . .], and to establish an objective test for determining whether sex crimes against a single victim occurred on separate occasions.' (Stats.1986, ch. 1431, § 2, p. 5129.) *Craft* had construed Penal Code section 667.6, subdivision (d) 'in a narrow manner,' as applying only when, between sexual assaults on a single victim, a defendant temporarily lost or abandoned the opportunity to continue his attack. (*Craft, supra,* 41 Cal.3d at p. 561 . . . .) The legislative history reveals the aim to provide 'a broader, less stringent standard to prove that multiple sex crimes occurred against the same victim on separate occasions.' (Cal. Youth and Adult Correctional Agency, Enrolled Bill Rep. on Assem. Bill No. 2295 (1985–1986 Reg. Sess.) Sept. 1986, p. 2.)" (*People v. Jones* (2001) 25 Cal.4th 98, 104, fn. 2.)

court could find a defendant had a 'reasonable opportunity to reflect upon his or her actions' even though the parties never changed physical locations and the parties 'merely' changed positions." (*People v. Irvin* (1996) 43 Cal.App.4th 1063, 1071.)

In *King*, *supra*, 183 Cal.App.4th 1281, consecutive sentences for a series of sexual assaults during one relatively brief incident were not an abuse of discretion, given, among other things, the defendant's "position of trust and authority . . . and the fact that he had an opportunity to stop—and chose not to . . . ." (*Id.* at p. 1326.) Here, Jane described a routine that occurred ever time appellant raped her, which involved taking off her clothes and touching her breasts and vagina, making her lie down and then taking off his clothes and getting on top of her before he placed his penis in her vagina. Here, the trial court could reasonably have concluded that between the oral copulation and the rape appellant had "a reasonable opportunity to reflect upon his or her actions" while removing his clothing and "nevertheless resumed sexually assaultive behavior." By statute, the trial court at sentencing is empowered to make the determination whether multiple sexual offenses occurred on separate occasions for purposes of imposing full consecutive terms. [Citations.]" (*People v. Groves* (2003) 107 Cal.App.4th 1227, 1230.)

The premise of appellant's argument that consecutive sentences were not mandatory is based on his assertion that the evidence failed to establish that the underlying rape and oral copulation occurred on separate occasions. As we have just established, such is not the case. Accordingly, we reject appellant's contention that the trial court erred by imposing consecutive sentences.[26]

---

[26] Appellant acknowledges that his counsel failed to object below when the court imposed consecutive sentences. He submits that no objection was necessary, but if it was necessary to preserve the issue for review, he argues that his counsel was ineffective. Since we have addressed the issue, we need not address appellant's ineffective assistance of counsel claim.

*Disposition*

The judgment is affirmed.

_____
ELIA, J.

WE CONCUR:


_____
RUSHING, P. J.


_____
PREMO, J.